# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-3824

DEAN HUDSON,

*Plaintiff-Appellant,*

v.

WAL-MART STORES, INC.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 02 C 1751—**Sarah Evans Barker**, *Judge.*

———————

ARGUED JUNE 2, 2005—DECIDED JUNE 21, 2005

———————

Before FLAUM, *Chief Judge*, and BAUER and EVANS,
*Circuit Judges*.

BAUER, *Circuit Judge*. During his brief stint as an em-
ployee at a Wal-Mart store in Indianapolis, plaintiff Dean
Hudson did not get along with co-worker Nicholas Ramirez.
Verbal sniping between Hudson and Ramirez eventually led
to a physical altercation at work, and Wal-Mart fired both
men shortly thereafter. Hudson, who was hospitalized for
injuries sustained in the altercation, filed a workers' com-
pensation claim based on the incident. He then brought suit
in state court, alleging that he was fired in retaliation for
the workers' compensation filing. Wal-Mart removed the

suit to federal court on the basis of diversity and moved for summary judgment. The district court granted the motion. We affirm.

## I. Background

The following facts are either undisputed or presented in the light most favorable to Hudson. Hudson began working at Wal-Mart as a Sales Associate on January 10, 2002. From approximately February 2002 until his termination, Hudson worked in the Sporting Goods Department. On April 10, 2002, Ramirez began working at Wal-Mart as a Stocker, and he often worked in or near the Sporting Goods Department. Hudson was not shy about sharing his opinion of Ramirez's work ethic and performance. Supp. App. 112-13. Hudson told Ramirez that he could never find him when he needed him, and that it seemed like Ramirez had no interest in helping. *Id.* Hudson informed co-workers that Ramirez was "worthless" and that he could not work with Ramirez. Hudson Depo. at 192-93. Hudson also complained to at least three supervisors about Ramirez. *Id.* at 167-69.

On April 26, 2002, Hudson and Ramirez were the only employees working in the Sporting Goods Department. Hudson complained to Acting Service Manager Portia Pate about Ramirez that night. Hudson said that Ramirez was "worthless" and that he and Ramirez were not getting along. Supp. App. at 118; Hudson Depo. at 169. Pate told Hudson to leave Ramirez alone and let management handle it if he was not doing his job. Hudson Depo. at 180-81. That same night, Hudson told Assistant Manager Matt Stetson that he could not work with Ramirez and that he wanted management to "get rid of" Ramirez. *Id.* at 178. Hudson also told Stetson that he and Ramirez had gotten into a "verbal confrontation" that evening. *Id.* at 168. Stetson separated Hudson and Ramirez by moving Ramirez to another department. Sometime between midnight and 12:30

a.m. on April 27, 2002, Hudson and Ramirez got into an argument in the Hardware Department. Ramirez struck Hudson in the side of the head and continued to strike him in the head and eye. Hudson suffered a dislocated shoulder and was taken to a hospital for treatment.

Later that day, Store Manager Shannon Cremeens began investigating the incident. Pate, Associate Saressa Owens, and Stetson all provided Cremeens with written statements regarding their knowledge of the events leading up to the incident. According to Pate, Hudson complained to her about Ramirez that night, saying that Ramirez was not performing his work responsibilities. Pate instructed Hudson to let management handle it and warned him to lower his voice because Ramirez was within earshot of the conversation. Owens reported that Hudson and Ramirez had been arguing since Ramirez was hired. On the night preceding the incident, Hudson told Owens that he and Ramirez had gotten into an argument, and Hudson said that Ramirez "wasn't shit" and "would never be shit." On the night of the incident, Owens heard Hudson tell Ramirez that he was "going to kick his ass at two o'clock when he get (sic) off."[1] Stetson reported that Hudson approached him the night before the altercation and stated that he could not work with Ramirez.

---

[1] Although Hudson denies making this statement and the previous statement, we include them in our opinion for the sole purpose of relating the information that Wal-Mart assembled during its investigation. The information from the investigation is relevant to Wal-Mart's non-retaliatory explanation for Hudson's termination and Hudson's pretext showing. At that stage, the focus is not on whether Wal-Mart credited the witnesses that we would have credited or Hudson would have credited, but on whether Wal-Mart came to an honest conclusion about the situation based on the information uncovered by the investigation. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.").

Co-Manager Michael Jodrey visited Hudson in the hospital to hear his side of the story. Hudson told Jodrey that Ramirez was yelling at him and threatening him with raised fists, and that Hudson walked away. According to Hudson, Ramirez approached him later and punched him repeatedly.

Based on the information obtained during the investigation, Cremeens concluded that Hudson and Ramirez should be terminated for violating Wal-Mart's Workplace Violence Policy. The Workplace Violence Policy provides, in relevant part:

> Harassment, violence, threats of violence, and other similar conduct are unacceptable behaviors and violations of Company policy. Any Associate who violates this policy will be disciplined, up to and including termination from the Company.

Ramirez, who left the store and never returned after the incident with Hudson, was fired on May 1, 2002. Hudson was fired on May 6, 2002, which was the first day he returned to Wal-Mart after the incident. Hudson appealed his termination internally at both the district and regional level. During those appeals, which were unsuccessful, Hudson admitted that he was partially at fault for the altercation.

A few days after the incident, Hudson contacted Lori Kord, Wal-Mart's Personnel Manager, and asked how to file for workers' compensation benefits. After contacting the insurance carrier about Hudson's potential claim, Kord told Hudson that she "could not guarantee" that Hudson's claim would be covered. Hudson felt like Kord "didn't cooperate with [him]" because she did not provide him with the workers' compensation paperwork. Hudson Depo. at 155. However, Kord did not refuse to give him the paperwork. *Id.* Hudson also asked Kord about filing a workers' compensation claim just prior to his exit interview with Jodrey on

May 6, 2002. Hudson ultimately filed for workers' compensation benefits on May 15, 2002, nine days after he was fired. Hudson was granted relief by the Indiana Workers' Compensation Board, and Wal-Mart has appealed the determination to the Indiana Court of Appeals.

## II. Discussion

Hudson's sole claim is that he was fired in retaliation for filing a workers' compensation claim. We review the district court's grant of summary judgment *de novo*, applying the familiar Rule 56 standards.

Indiana generally adheres to the employment-at-will doctrine. However, in *Frampton v. Cent. Ind. Gas Co.*, 260 Ind. 249 (Ind. 1973), the Indiana Supreme Court carved out an exception to that rule. The plaintiff in *Frampton* alleged that she was hesitant to file a workers' compensation claim after a work-related injury because she feared a retaliatory termination. *Id.* at 250. The plaintiff eventually filed a claim and was fired without explanation about one month later. *Id.* The plaintiff filed suit to challenge the termination, but the suit was dismissed based on Indiana's employment-at-will doctrine. *Id.* The Indiana Supreme Court reversed. *Id.* at 254. The Court explained that "[t]he basic policy behind [the workers' compensation statute] is to shift the economic burden for employment connected injuries from the employee to the employer." *Id.* at 251. That policy would be frustrated if employees opted not to file workers' compensation claims due to fear of reprisal. *Id.* at 251-52. As a result, the Court recognized a cause of action for employees discharged in retaliation for filing a workers' compensation claim. *Id.* at 253. These types of retaliation claims are now known as *Frampton* claims in Indiana.

To maintain a *Frampton* claim, Hudson must establish a causal connection between his termination and the filing of his workers' compensation claim. *Goetzke v. Ferro Corp.*,

280 F.3d 766, 774 (7th Cir. 2002). Because Hudson does not have direct evidence, he must rely on indirect evidence of retaliatory motive, such as proximity in time between the filing of the claim and the termination or evidence that the employer's asserted lawful reason for the discharge is a pretext. *Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002) (citation omitted). Hudson can establish pretext by demonstrating that Wal-Mart's explanation for the firing was either dishonest or "patently inconsistent with the evidence before the court." *Markley Enters., Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999).

At the outset, it appears that Hudson's claim founders on timing because he did not file his workers' compensation claim until *after* he was fired. If Hudson did not file his claim until after his termination and Wal-Mart did not know that he intended to file a workers' compensation claim until it received notice of the filing, then Hudson would not be able to establish causation. However, Hudson testified that he contacted Lori Kord, Wal-Mart's Personnel Manager, and asked how to file for workers' compensation benefits shortly after the incident, which would have been at least a few days before he was fired. A reasonable jury could infer that news of this inquiry made its way to management at the Indianapolis Wal-Mart, particularly considering that management was questioning store employees about Hudson subsequent to the altercation with Ramirez. In addition, even though the *Frampton* Court spoke in terms of retaliation for the *filing* of a workers' compensation claim, its rationale is broad enough to cover plaintiffs in Hudson's circumstances who have at least informed their employer of an intent to file a claim prior to being discharged. Otherwise, an employer could avoid the dictates of *Frampton* and the Indiana Workman's Compensation Statute by preemptively terminating employees as soon as it caught wind that an injured employee was considering a claim. Consequently, the fact that Hudson did not file for

workers' compensation benefits before his termination is not fatal to his claim. Nevertheless, Hudson does not have enough evidence of causation to reach a jury.

Hudson claims to have both pretext evidence and proximity in time evidence that raise questions about Wal-Mart's motivations for firing him. We start with the proffered pretext evidence. Wal-Mart has offered a legitimate, non-retaliatory reason for firing Hudson: He was involved in a physical altercation at work with a co-worker after weeks of bickering. Specifically, Cremeens concluded that Hudson violated Wal-Mart's Workplace Violence Policy by provoking the altercation with Ramirez. *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001) ("It is well-established that an employee can be terminated for violations of valid work rules that apply to all employees."). Hudson's attempts to undermine this explanation are both unpersuasive and largely irrelevant. Hudson first argues that it is suspicious that Wal-Mart fired him five days after firing Ramirez rather than firing them simultaneously. We fail to see how this is a suspicious circumstance. Ramirez ran out of the store after the incident, never returned, and was fired on May 1; Hudson was fired five days later, which was the first day he returned to work. Hudson offers nothing other than speculation to prove that the lag between the terminations was an indication of retaliation, and a plaintiff's speculation is insufficient to establish pretext.

Hudson next challenges the accuracy of Cremeens' conclusions about the incident, describing himself as "the innocent victim in a workplace skirmish." Pl.'s Brief at 23. This description is inconsistent with Hudson's admission during his internal appeals that he was partially at fault for the altercation, and also difficult to square with the record of Hudson's campaign to "get rid of" Ramirez. The argument is also beside the point. The judiciary is not a super-personnel department that reexamines and reinvestigates employee disputes. *Foster v. Arthur Anderson, LLP*, 168 F.3d

1029, 1035 (7th Cir. 1999). Our only concern is whether Wal-Mart's proffered explanation is a lie to cover-up for retaliation, and Wal-Mart's conclusion that Hudson was not "an innocent victim in a workplace skirmish" was not so patently inconsistent with the evidence that it suggests that retaliation was afoot.

Hudson's final pretext argument is equally as feeble. He asserts that Wal-Mart's investigation "lacked integrity" because Cremeens believed the statements of third parties over his version of the story. This is a tough argument to make—Wal-Mart credited the consistent statements of Hudson's co-workers and supervisors over his own statement, and Hudson was the only one with an obvious interest in the outcome of the investigation. Ramirez, the other potentially interested party, did not contribute to the investigation because he left Wal-Mart for good after the incident. At any rate, like Hudson's other arguments, it does not call into question the sincerity of Wal-Mart's conclusions about the incident.

That leaves us with Hudson's proximity evidence. Hudson notes that he was fired shortly after inquiring about his workers' compensation rights and insists that this timing evidence is sufficient in and of itself to raise an inference of retaliatory intent. We disagree. First, the same underlying incident led to both Hudson's termination (at least the stated reason for it, which Hudson has not effectively undermined) and his workers' compensation claim, which makes Hudson's timing evidence a wash. Second, timing evidence is rarely sufficient in and of itself to create a jury issue on causation. Indeed, in the analogous Title VII context, we have held that timing, "standing alone, does not create a genuine issue as to casual connection." *Foster*, 168 F.3d at 1034 (citation omitted). Other evidence of retaliation, whether significant or modest, could make the timing evidence stronger and provide a plaintiff with a basis to argue that a reasonable jury could find in his favor. But in

the instant case, Hudson's timing evidence falls flat; it is not buttressed with other evidence that suggests retaliatory motivations. It would also be inappropriate to attach significant weight to Hudson's proximity evidence in that Wal-Mart has offered a strong, credible reason for firing Hudson. *Cygan v. Wis. Dep't of Corrs.*, 388 F.3d 1092, 1102-03 (7th Cir. 2004) (noting that employee must rely on more than *post hoc ergo propter hoc* reasoning where employer has offered a well-supported, innocent explanation for action). It is difficult to think of a better reason to fire an employee than for involvement in a physical altercation at work with a co-worker. More importantly for our purposes, the record supports Wal-Mart's explanation, Hudson's only plausible riposte is proximity evidence, and no reasonable jury could find that Hudson was fired in retaliation for his inquiry about workers' compensation rights on that basis alone.

### III.  Conclusion

For the reasons stated herein, we AFFIRM the decision of the district court.

A true Copy:

    Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*