In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3388

AARON SMEIGH,

*Plaintiff-Appellant,*

*v.*

JOHNS MANVILLE, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:09-cv-414-TWP—**Tanya Walton Pratt**, *Judge.*

ARGUED APRIL 6, 2011—DECIDED JUNE 29, 2011

Before FLAUM, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Aaron Smeigh brings this diversity suit against his former employer, Johns Manville (JM), for retaliatory discharge and civil conversion under Indiana law. He alleges that JM wrongfully terminated his employment for filing a workers' compensation claim and unlawfully retained his personal property after his termination. JM moved for summary judgment on Smeigh's claims and the district court granted the motion. Smeigh appeals.

We affirm. Smeigh has not presented sufficient evidence upon which a reasonable jury could conclude that he was fired in retaliation for filing workers' compensation. Although he was terminated shortly after his workplace injury, the evidence shows that JM terminated him for his post-accident statement that he might not pass a drug test (he later passed the drug test) and subsequent refusal to sign an agreement presented by JM requiring him to undergo counseling and random drug testing (at Smeigh's expense) to retain his job. Smeigh made no showing that JM's proffered reason for terminating him was a lie to cover up retaliation.

Smeigh similarly has not presented evidence that JM knowingly exerted unauthorized control over his property. It was company protocol after termination to sort through an employee's belongings to separate personal property from company property. Smeigh didn't object when Bernice Wilson, a JM employee and union secretary, indicated she would clean out his locker and temporarily take possession of his belongings. His property (tools) was then stolen from Wilson's office. Smeigh, however, never informed JM that Wilson still had possession of his tools or that he objected to her temporary possession of them. He waived any claim to vicarious liability and without providing some evidence that JM had the requisite mens rea, Smeigh's claim fails as a matter of law.

## I. Background

Smeigh started working for JM in 1994 and throughout his employment belonged to a union. Smeigh was an excellent, reliable, and tireless worker. He was considered

knowledgeable, had a spotless employment record, and would often work overtime hours—50 to 60 hours a week. On September 20, 2008, Smeigh suffered a workplace injury—he severed the tip of his finger while moving a fiberizer cart. While waiting for an ambulance in the parking lot, he spoke to his direct supervisor, Bill Seamans. JM enforced a policy that required workers injured on the job to submit to drug testing. Smeigh testified as follows:

> Bill asked me if I would have any problems passing a drug test. And I told him I should not have any problems passing a drug test, because I do not use drugs. And I said if by any chance that I was to come up inconclusive or positive, it's not because I was on any drugs. And he asked me what I meant by that. And I told him about a week prior I had went into a room where some pot had been smoked. And I did not know if it would show up in my system as a positive result as, you know, secondhand breathing.

Acting plant manager Matt Weber arrived on the scene as the ambulance took Smeigh to the hospital. Seamans explained to Weber the nature of the injury and told Weber that Smeigh might potentially fail a drug test. Weber did not talk to Seamans about the incident after having this conversation.

Weber went to the hospital with Smeigh. The parties dispute the content of their conversation at the hospital. Smeigh claims they did not talk about marijuana or drug use. Weber claims that Smeigh told him that he (Smeigh)

had smoked marijuana over Labor Day weekend. Because this case comes to us on JM's motion for summary judgment, we take the facts in the light most favorable to Smeigh and assume that Smeigh never admitted to smoking marijuana. Smeigh took a drug screen at the hospital that came back negative. He had surgery a few days later and after the surgery, Weber visited Smeigh and requested that he go into work that afternoon. Upon the advice of his doctors, Smeigh declined. Smeigh didn't discuss workers' compensation with JM. Instead, JM took the initiative and filed for workers' compensation on Smeigh's behalf.

Despite Smeigh's negative drug results, Weber decided to investigate whether Smeigh's "admission" was a violation of JM's substance abuse policy. The relevant policy in effect stated:[1]

> [T]he use, sale, possession, purchase or transfer of illegal drugs while on or off the job is prohibited and will not be tolerated. The off-the-job use of alcohol or drugs in any manner that adversely affects job performance will also not be tolerated. Violation of this policy will result in disciplinary

---

[1] Smeigh contends that JM had three different substance abuse policies: one in the employee handbook (July 1998), one titled "Uniform Substance-Free Workplace Policy," and the one quoted here dated July 2007. Smeigh didn't properly authenticate the first two policies, and therefore, they aren't admissible. Even if admissible, the evidence showed that the July 2007 policy was in effect at the time of the accident and this was the policy Weber referenced.

measures against the offender and may result in termination of employment.

. . . If an employee voluntarily comes forward and identifies a substance abuse problem prior to an investigation commenced by the company, employee assistance will be provided on a one-time basis with no impact on job status . . . .

Weber contacted JM's Human Resource Manager Gail Threet and she determined that Smeigh had breached the substance abuse policy based on what Weber told her. She attested: "From my conversation with Weber, I understood, while waiting for the ambulance, Smeigh told his direct supervisor [the he] would not pass a drug test. I further understood Smeigh discussed his use of marijuana with Weber while Weber was at the hospital after the accident." Threet concluded that "Smeigh had made an involuntary admission of illegal drug use and violated JM's Substance Abuse Policy."

JM decided not to terminate Smeigh as long as he signed a Stipulation of Understanding. Weber met with union representatives to discuss the Stipulation. On September 24 (four days after his injury), Smeigh attended a meeting with JM management and union representatives where he was presented with the Stipulation, which provided:

(1) Mr. Smeigh will be required to meet with an EAP [employee assistance program] counselor and sign appropriate release of information forms . . . .

(2) Mr. Smeigh must comply with and complete all counseling recommendations referring to mind

altering chemicals. Verification of completion is required.

(3) Mr. Smeigh must submit to eight (8) random drug and alcohol detection tests or test for cause within twelve (12) months of returning to work . . . . Any confirmed positive results will result in termination.

(4) All expenses not covered by treatment programs will be the responsibility of Mr. Smeigh.

(5) Any violation of this agreement as determined by the Company will result in immediate termination of Mr. Smeigh, regardless of any special circumstances that might surround the violation.

During the meeting, no one mentioned workers' compensation.

Smeigh refused to sign the Stipulation even though he was aware that not signing would likely result in termination. He reasoned that he never violated the substance abuse policy and didn't think JM was following proper disciplinary procedures given his negative drug test results and flawless work record. He also thought it was illegal for JM to require him to pay for the requested drug testing. JM terminated Smeigh and sent him the official termination letter on September 25. The letter indicated he was terminated for refusing to sign the Stipulation. When asked if this was an accurate reason for his termination, Smeigh responded: "Because I refused to sign the stipulation and understand it, yes, that's an accurate reason why I was fired." Later in his deposition, Smeigh testified that he

believed he was terminated because he was injured on the job and had a lost-time accident. He testified: "[T]he equipment that I was injured on was immediately shut down for the next 12 hours, both lines. So they had 24 hours worth of downtime where they moved the drivers over that I got hurt on, which to me states that they were negligent on the installation of the drivers and were trying to cover their butts . . . from OSHA."

The union filed a grievance on behalf of Smeigh, but didn't arbitrate his case. Instead, the union called Smeigh into a meeting in February 2009 to sign a Reinstatement Agreement to settle the grievance. That agreement had less onerous terms than the Stipulation. It required Smeigh to submit to another drug screen upon withdrawal of his grievance. If the test came back negative, JM would reinstate Smeigh with full seniority, but not back pay. If reinstated, Smeigh would be subject to a maximum of four random drug tests over the next two years; JM agreed to pay all costs of the drug tests. The union encouraged Smeigh to sign, but Smeigh refused because he believed that JM "had no grounds" to require him to sign the agreement, and he did not want to blemish his work record. (At oral argument, counsel for Smeigh also pointed to the fact that the agreement didn't provide back pay as a basis for Smeigh's refusal to sign. Of course, counsel's argument cannot be a substitute for record evidence).

At the time of his termination, Bernice Wilson, as union recording secretary, informed Smeigh that the union and company would be cleaning out his lockers and toolboxes, and that he would then get his personal property back.

Smeigh acknowledged that when employees are termi-
nated, JM must separate their personal property from
company property. Smeigh did not raise the issue of his
personal property with JM because he "assumed that [he]
would be getting [his] job back after the grievance process,
after it went to arbitration." Smeigh's locker was cleaned
out and Wilson took possession of his property. Smeigh
later contacted Wilson about his property. He testified:

> I had inquired about my tools with Bernice Wilson.
> And she said that she had sent a few [personal]
> items home . . . . But as far as my tools, she in-
> formed me that they were in her office, and that
> she needed to go through them. Then about a week
> later, she informed me that some of my tools had
> been stolen out of her office, and that she would
> have to replace them. And I've never heard from
> her since on the issue of my tools.

## II. Discussion

Smeigh asserts that the district court erred in granting
summary judgement to JM on his claims for retaliatory
discharge and conversion. We review a district court's
grant of summary judgment de novo, construing all facts
and reasonable inferences in the light most favorable to
the non-moving party. *Spivey v. Adaptive Mktg. LLC*, 622
F.3d 816, 822 (7th Cir. 2010). Summary judgment is appro-
priate if "the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled
to judgment as a matter of law." Fed. R. Civ. P. 56(a).
Even construing the facts in favor of Smeigh, we agree with

the district court that he cannot succeed on either his retaliation or conversion claim as a matter of law.

## A. Retaliatory Discharge

Under Indiana law, "[g]enerally, employers may terminate employees for no cause whatsoever or for any cause at all without incurring liability." *Hamann v. Gates Chevrolet, Inc.*, 910 F.2d 1417, 1418 (7th Cir. 1990). One exception to this general rule is that an employee who has been discharged in retaliation for filing a workers' compensation claim may recover damages for wrongful termination. *Frampton v. Cent. Ind. Gas Co.*, 297 N.E.2d 425, 428 (Ind. 1973) (holding that an employee who alleges he was discharged in retaliation for filing a claim pursuant to the Indiana Workmen's Compensation Act has stated a claim upon which relief can be granted). To survive summary judgment on a *Frampton* claim, the plaintiff must present evidence that would support a finding that the discharge was caused by his filing for benefits. *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002). A successful litigant must demonstrate that his discharge was solely in retaliation for the exercise of a statutory right, meaning that any and all reasons for the discharge must be unlawful in order to sustain a claim. *Purdy v. Wright Tree Serv., Inc.*, 835 N.E.2d 209, 212 (Ind. Ct. App. 2005).

Causation may not be inferred merely from evidence that the employee filed for benefits and was fired. *See Hamann*, 910 F.2d at 1420. Because Smeigh "does not have direct evidence, he must rely on indirect evidence of retaliatory motive, such as proximity in time between

the filing of the claim and the termination or evidence that the employer's asserted lawful reason for the discharge is pretext." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 785 (7th Cir. 2005). "[T]iming evidence is rarely sufficient in and of itself to create a jury issue on causation[,]" *id.* at 787, but "when considered with other circumstances, the temporal proximity between termination and filing of the worker's compensation claim may satisfy the plaintiff's burden in some cases[,]" *Goetzke*, 280 F.3d at 774.

A plaintiff bringing a retaliation claim must first prove, by a preponderance of the evidence, his prima facie case. *Powdertech Inc. v. Joganic*, 776 N.E.2d 1251, 1262 (Ind. Ct. App. 2002). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge. *Id.* If the employer meets that burden, then the employee has the opportunity to prove, again by a preponderance of the evidence, that the reason offered by the employer is pretextual. *Id.* Pretext can be shown by demonstrating that the employer's "explanation for the firing was either dishonest or patently inconsistent with the evidence before the court." *Hudson*, 412 F.3d at 785 (quotations omitted). To make this showing, an employee must produce evidence showing that (1) the employer's stated reason has no basis in fact; (2) although based on fact, the stated reason was not the actual reason for discharge; or (3) the stated reason was insufficient to warrant the discharge. *Powdertech*, 776 N.E.2d at 1262. The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered. *See Purdy*, 835 N.E.2d at 214 ("[T]he issue

of pretext does not concern the appropriateness of the reasons offered by the employer for its employment decisions[;] . . . the issue [is] whether the employer honestly believes in the explanation it offers.").

In *Hudson*, the plaintiff employee was punched by another employee and taken to the hospital for injuries. 412 F.3d at 783-84. Wal-Mart investigated the accident and determined that the plaintiff had provoked the fight. Both employees were terminated pursuant to Wal-Mart's Workplace Violence Policy. After the incident, the plaintiff inquired about filing for workers' compensation. *Id.* He returned to work about a week later, at which time he was informed of his termination. *Id.* at 784. The plaintiff subsequently filed for workers' compensation. *Id.* at 785. We found that Wal-Mart offered a legitimate, non-retaliatory reason for firing the plaintiff—he was involved in a physical altercation at work with a co-worker after weeks of bickering—and the plaintiff's argument that he shouldn't have been fired because he was an innocent victim was "beside the point." *Id.* at 786. We reasoned that "[t]he judiciary is not a super-personnel department that reexamines and reinvestigates employee disputes." *Id.* Our concern is whether the proffered reason given by the employer is a lie to cover up for retaliation. *Id.* The plaintiff in *Hudson* could not make this showing. *Id.*

We acknowledged that the plaintiff in *Hudson* was fired shortly after he inquired about workers' compensation, but we stated that this alone was insufficient to defeat summary judgment. *Id.* at 786-87. We reasoned that the "same underlying incident led to both Hudson's termina-

tion (at least the stated reason for it, which Hudson [did] not effectively undermine) and his workers' compensation claim, which ma[de] Hudson's timing evidence a wash." *Id.* We held that the timing evidence was not sufficient, in and of itself, to create a fact issue for the jury. *Id.* at 787. While other evidence of retaliation could make the timing evidence stronger (allowing a reasonable jury to find in the plaintiff's favor), the plaintiff didn't present such evidence. *Id.* Instead, Wal-Mart offered a strong credible reason for terminating the plaintiff, and thus, we found it inappropriate to attach significant weight to the plaintiff's proximity evidence. *Id.*

Smeigh relies heavily on proximity evidence to support his claim for retaliation. If timing was all that was needed to create a reasonable inference of retaliation, Smeigh would have a good case. He was terminated shortly after his accident and the filing for workers' compensation. But as *Hudson* explains, timing evidence, by itself, is rarely sufficient to create a jury question. That is especially true here where there was an intervening event leading to Smeigh's termination and no evidence of pretext. *See Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 594 (7th Cir. 2008) (finding the plaintiff unable to make a casual connection even though she was disciplined and terminated shortly after her injury where there were several intervening events, including a series of unexercised absences, leading to her termination); *see also Purdy*, 835 N.E.2d at 214 (finding employer's reason for discharge wasn't a pretext for discrimination; rather, the cause of Purdy's discharge was his medical inability to return to work at the conclusion of his FMLA leave period). The

facts show that Smeigh was terminated for his failure to sign the Stipulation after he indicated he might not pass a drug test. Smeigh has not presented sufficient evidence to create a genuine issue of material fact that JM's stated reason for Smeigh's discharge was pretextual.

It is undisputed that at the time of his injury Smeigh indicated to his supervisor that there was a possibility that he might not pass a drug test—not because he was a drug user, but because he had been around marijuana smoke. This admission, however, was reason for JM to investigate and take efforts to ensure that Smeigh was not a drug user. JM has a workplace policy against offsite drug use and JM had reason to believe Smeigh violated this policy even though he tested negative for drugs. "It is well-established that an employee can be terminated for violations of valid work rules that apply to all employees . . . ." *Powdertech*, 776 N.E.2d at 1262. Smeigh argues that JM violated its internal substance abuse policy for someone who voluntarily admits to drug use, and JM's failure to follow its own policy constitutes evidence of pretext. *See e.g.*, *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) ("[A]n employer's failure to follow its own internal employment procedures can constitute evidence of pretext."). Smeigh, however, wasn't terminated until he refused to sign the Stipulation, so his argument boils down to this: JM sought to retaliate against him for filing a workers' compensation claim by presenting him with the Stipulation in violation of its internal policy. This argument makes little sense. First, JM filed for workers' compensation on Smeigh's behalf and second, if Smeigh had signed the Stipulation, he

would have retained his job. The terms of the Stipulation certainly weren't so onerous as to result in constructive discharge, *Baker v. Tremco, Inc.*, 917 N.E.2d 650, 655 (Ind. 2009) (stating that a cause of action for constructive retaliatory discharge exists for an employee who can show that he has been forced to resign as a result of exercising this statutorily conferred right), nor does Smeigh make this argument. The record shows that JM wanted Smeigh to sign the Stipulation and retain his job. Given these intervening facts between his injury and discharge, Smeigh's argument that he was fired in retaliation for obtaining workers' compensation falls flat.

Further, Threet's conclusion that Smeigh made an involuntary admission of illegal drug use was not so "patently inconsistent with the evidence" to "suggests that retaliation was afoot." *Hudson*, 412 F.3d at 786. JM could conclude that Smeigh's statement about possibly not passing a drug test, made only after he was aware he'd have to submit to one, was not voluntary within the meaning of JM's substance abuse policy. His explanation about being in a room with marijuana smoke was certainly curious. Even if he had made a voluntary admission within the parameters of the substance abuse policy, despite Smeigh's contentions to the contrary, he was offered employee assistance and the ability to retain his job.

It is not for us to decide whether Smeigh should have been required to sign the Stipulation. *See e.g, O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (finding no pretext under Title VII and ADEA where the employee was required to sign an employment agree-

ment that she claimed was unlawful; "the fact that the Agreement may have been unnecessary, ineffective or unenforceable would, at most, indicate that [the employer] made a bad business decision," but it didn't demonstrate that the employer implemented the Agreement to justify the firing of older women). The only question before us is whether requiring Smeigh to sign the Stipulation to keep his job was pretext for retaliatory motive. There is nothing to show that it was. The fact that JM was willing to allow Smeigh to sign a Reinstatement Agreement (with less onerous terms) further supports a conclusion that JM's reasons for termination weren't pretextual and that JM was legitimately concerned that Smeigh was using (or had used) illegal drugs. Smeigh points to nothing in the record to show that JM's decision to terminate him had anything to with workers' compensation.

Smeigh cites to *Markley Enterp., Inc. v. Grover*, 716 N.E.2d 559 (Ind. Ct. App. 1999) and *Dale v. J.G. Bowers, Inc.*, 709 N.E.2d 366 (Ind. Ct. App. 1999), in support of his claim, but in both those cases there was evidence of pretext. In *Markley*, the court held that a jury could find pretext because there was evidence that the employer had disciplined the plaintiff on a prior occasion for allegedly attempting to file a false workers' compensation claim. 716 N.E.2d at 566. Further, "[a]n internal Company memo disclose[d] an extremely hostile attitude against [the plaintiff] for having attempted to file the previous [workers' compensation] claim and stated that [the plaintiff's] employment would be terminated immediately in the event of 'any repeat violations.'" *Id.* The court found those facts sufficient to raise an issue of whether the

employer's true motive for terminating the plaintiff's employment was his filing of the workers' compensation claim. *Id.* Similarly, in *Dale*, 709 N.E.2d at 369-70, the court found that a jury could infer pretext where the employer's stated reason for termination—that employee's medical restrictions rendered him unable to fulfill his job duties—was inconsistent with evidence that his job restrictions were temporary and where the employee was discharged just two days after returning to work and one day after receiving an impairment rating. The outcome in *Dale* was based not on suspicious timing alone, but on suspicious timing combined with strong evidence of pretext. Smeigh hasn't shown similar evidence of pretext.

Our concern is whether JM's proffered reason for terminating Smeigh was a lie to cover up retaliation. As in *Hudson*, Smeigh did not make this showing and no reasonable jury could find in his favor based on the evidence presented.

## B.  Criminal Conversion

Smeigh also brings a claim for criminal conversion against JM. To succeed, Smeigh has to show that JM "knowingly or intentionally exert[ed] unauthorized control" over his property. Ind. Code § 35-43-4-3(a). "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." *Id*. § 35-41-2-2(b). A person's control over property of another person is "unauthorized" if it is exerted "in a manner or to an extent other than

that to which the other person has consented." *Id.* § 35-43-4-1(b)(2). A person who has suffered a pecuniary loss as a result of a criminal conversion may bring a civil action to recover the loss. *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008). A claimant in a civil action must only show that the defendant committed the criminal act by a preponderance of the evidence. *French-Tex Cleaners, Inc. v. Cafaro Co.*, 893 N.E.2d 1156, 1166 (Ind. Ct. App. 2008).

Smeigh must prove all the elements of the alleged criminal act. *Id.* at 1166. Criminal intent is an essential element of criminal conversion. *Id.* "It is this *mens rea* requirement that differentiates criminal conversion from a more innocent breach of contract or failure to pay a debt, which situations the criminal conversion statute was not intended to cover." *Id.* at 1168 (finding no conversion where the defendant acted in accordance with reasonable interpretation of an ambiguous contract); *NationsCredit Commercial Corp. v. Grauel Enters., Inc.*, 703 N.E.2d 1072, 1079 (Ind. Ct. App. 1998) (same). A defendant's reasonable belief that she controlled or continued to control property with the owner's consent defeats the mens rea element of conversion. *Whitlock v. Brown*, 596 F.3d 406, 413 (7th Cir. 2010). If the mens rea element exists, even a temporary deprivation of property is sufficient to succeed under the statute. *Id.*[2]

---

[2] Mens rea, however, is not an element of tortious conversion. *Computers Unlimited, Inc. v. Midwest Data Sys., Inc.*, 657 N.E.2d 165, 171 (Ind. Ct. App. 1995). Smeigh did not bring a claim for

(continued...)

There is no evidence in the record that Wilson's control over Smeigh's property was unauthorized or even if it was unauthorized, that she was aware of a high probability that her control was unauthorized. Smeigh acknowledged that it was company protocol to sort through a terminated employee's belongings to separate personal property from company property. He was aware that Wilson was going to take his property and separate his tools from JM's tools; yet, he never objected. Smeigh inquired about his property, and Wilson told him that she still needed to go through his tools. The record doesn't suggest that Smeigh demanded the immediate return of his tools[3] or gave Wilson any indication that her temporary possession of them was unauthorized. A week later, Wilson informed Smeigh that they had been stolen from her office. She offered to replace them, but then Smeigh

---

[2] (...continued)

tortious conversion, which "consists either of the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's." *Id.; see also Schrenker v. State*, 919 N.E. 2d 1188, 1194 (Ind. Ct. App. 2010) (explaining the difference between criminal and tortious conversion).

[3] Smeigh contends that JM continued to possess his tools despite his repeated requests for them. There are no record citations for these factual contentions and they are contradicted by the record. We therefore do not consider such facts. *See* Fed. R. App. P. 28(a)(9)(A) (requiring citations to the record).

never heard from her. Although a demand for return "is not itself an element of criminal conversion," *Lambert v. Yellowbird, Inc.*, 496 N.E.2d 406, 409-10 (Ind. Ct. App. 1986), Smeigh had to present evidence to raise a reasonable inference that Wilson was aware that her possession was unauthorized. He failed to do so.

More importantly, there is no evidence that JM was aware that Wilson still had Smeigh's tools or that her continued possession of them was unauthorized. Wilson is not part of JM management; she is an hourly employee. Smeigh testified that he didn't raise the issue of his personal property when he was terminated because he "assumed that [he] would be getting [his] job back after the grievance process, after it went to arbitration." After that day, Smeigh never inquired with a JM manager about the return of his property.

An employer can be held liable for conversion as a result of its employee's actions under the doctrine of respondeat superior. A company "may be convicted of an offense . . . if it is proved that the offense was committed by its agent acting within the scope of his authority." Ind. Code § 35-41-2-3. This section creates "a statutory version of respondeat superior" pursuant to which principals are liable for offenses committed by an agent acting within the scope of his authority. *Tippecanoe Beverages, Inc. v. S.A. El Aguila Brewing Co.*, 833 F.2d 633, 637 (7th Cir. 1987). Oddly, Smeigh didn't raise an argument of vicarious liability at the district court, even though it was addressed by JM in its summary judgment brief. At oral argument, Smeigh acknowledged that he didn't raise vicarious

liability below and wasn't raising it on appeal. Smeigh therefore has waived this argument. As the district court stated, "Without a vicarious liability hook or evidence to establish criminal intent, Smeigh's conversion claim fails." *Smeigh v. Johns Manville, Inc.*, No. 1:09-cv-0414, 2010 WL 3781492, at *10 (S.D. Ind. Sept. 2, 2010). We similarly conclude that Smeigh, who arguably may have had a claim arising in negligence for the loss of his property, *see Kottlowski v. Bridgestone/Firestone, Inc.*, 670 N.E.2d 78, 82-84 (Ind. Ct. App. 1996) (finding genuine issue of material fact on bailment claim where employees left their tools at employer's premises and they were stolen), cannot make out a claim for criminal conversion.

JM contends that Smeigh's conversion claim is frivolous and seeks sanctions pursuant to Rule 38 of the Federal Rules of Appellate Procedure. We agree that his claim is frivolous, but for the reasons stated below, we decline to award monetary damages to JM. Rule 38 states: "If a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee." Fed. R. App. P. 38.[4] Under Rule 38, we must first determine

---

[4] Rule 38 requires either a separately filed motion or that we give notice we are considering sanctions. *Greviskes v. Univ. Research Ass'n, Inc.*, 417 F.3d 752, 761 (7th Cir. 2005). We have stated that "a statement inserted in a party's brief that the party moves for sanctions is not sufficient notice." *Id.; see also* Fed. R. App. P. 38 advisory comm. notes (1994 amendments) ("Requests

(continued...)

if the appeal is frivolous, and if we find it is, we have discretion to award sanctions or decline to do so. *In re Bagdade*, 334 F.3d 568, 581 (7th Cir. 2003). "An appeal is frivolous when the result is obvious or when the appellant's argument is wholly without merit." *Grove Fresh Distribs., Inc. v. John Labatt, Ltd.*, 299 F.3d 635, 642 (7th Cir. 2002) (quotations omitted). "Pursuing a frivolous appeal invites sanctions, including just damages, which we may impose in our considered discretion." *Id.* "Sanctions are appropriate if the appellant merely restates arguments properly rejected by the district court that are unsupported by a reasoned colorable argument for altering the district court's judgment." *Perry v. Pogemiller*, 16 F.3d 138, 140 (7th Cir. 1993). We have held that "the combination of frivolous legal arguments . . . and frivolous factual arguments" may warrant sanctions. *In re Bagdade*, 334 F.3d at 581 (citation omitted).

Smeigh did not address any of the district court's well-reasoned explanations for dismissing his conversion claim. His argument at the district court and on appeal spans less

---

[4] (...continued)

in briefs for sanctions have become so commonplace that it is unrealistic to expect careful responses to such requests without any indication that the court is actually contemplating such measures."). JM didn't file a separate motion for sanctions; it argued for sanctions in its brief and Smeigh failed to respond to JM's request (Smeigh didn't file a reply brief). Smeigh was then given the opportunity to address sanctions during oral argument. Because we decline to issue monetary sanctions, we do not need to consider whether notice to Smeigh under these circumstances is sufficient under Rule 38.

than one page and is wholly undeveloped. Rather than restructuring his argument to demonstrate that the district court's decision was in error, he instead cut and pasted his summary judgment argument into his appellate brief—"a tactic which could not hope to succeed on appeal." *See Bagdade*, 334 F.3d at 582. The district court pointed out a significant flaw in Smeigh's claim—he didn't make any argument that JM could be held liable for the actions of its employee. The district court also noted that Smeigh's factual assertion that he had demanded the return of his property from JM was unsupported by the record. Even though the district court pointed out that his claim was hopeless, Smeigh persisted in pursuing it on appeal, making the same (nearly verbatim) frivolous arguments. *See e.g., Perry*, 16 F.3d at 140 (issuing sanctions when appellant "offered no valid legal support for his position on appeal other than that properly rejected by the district court").

Smeigh's counsel responded at oral argument that our review is de novo and he can raise the same arguments to this court as below and isn't permitted to raise new arguments. Although true, he certainly could have explained why the district court's decision was erroneous—for example, he could have explained how Smeigh can succeed without asserting vicarious liability—or, if he has no explanation, he could have decided not to appeal his conversion claim.

"Rule 38 is permissive"; we may "decline to impose sanctions even if the appeal is frivolous." *Indep. Lift Truck Builders Union v. Nacco Materials Handling Group*,

202 F.3d 965, 969 (7th Cir. 2000) (quotations omitted). "How we exercise [our] discretion may turn on our perception of whether an appellant acted in bad faith." *Berwick Grain Co., Inc. v. Ill. Dep't of Agric.*, 217 F.3d 502, 505 (7th Cir. 2000). We find that this case is too close to the line to warrant monetary sanctions. *See Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 499 (7th Cir. 2007) (sanctions not imposed but attorney warned that he was "skating near the edge of his pond"). Smeigh raised a non-frivolous argument (retaliatory discharge) on appeal, and JM had to expend only minimal effort in responding to Smeigh's frivolous conversion claim. We nonetheless admonish counsel for appellant, Joel S. Paul, that this portion of his appeal does not meet our standards for presenting and developing arguments on appeal.

### III. Conclusion

For the reasons set forth above, the judgment of the district court is AFFIRMED.