In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1550

HARRIS N.A.,

*Plaintiff-Appellee*,

*v.*

LOREN W. HERSHEY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-06661—**Sidney I. Schenkier**, *Magistrate Judge.*

ARGUED FEBRUARY 15, 2013—DECIDED MARCH 29, 2013

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In this appeal, a loan guarantor has sought to avoid liability on his guaranty despite a complete absence of any defense supported by evidence or colorable legal arguments. We affirm the district court's grant of summary judgment in favor of the lender. Because the appeal is frivolous, we also impose sanctions on the guarantor under Federal Rule of Appellate Procedure 38.

I. *Factual and Procedural Background*

In February 2008, as the United States was on the brink of its most serious financial crisis since the Great Depression, plaintiff-appellee Harris N.A. agreed to lend Acadia Investments L.C. up to $12.5 million on a revolving basis. Acadia Investments is a limited liability company consisting of members of the Hershey family and three trusts — one charitable trust and two family trusts. The loan was personally guaranteed by defendant-appellant Loren W. Hershey, a managing member of Acadia. In August 2008, the amount of the loan was enlarged to $15.5 million, again guaranteed by Hershey. The agreement enlarging the loan amount required Acadia to reduce its principal debt to Harris to less than 35 percent of the value of Acadia's assets by the end of each quarter and to make a principal payment of $3 million by January 31, 2009.

By February 2009, Acadia had not made the $3 million principal payment and was in default. The parties agreed to a forbearance agreement in June 2009 to give Acadia more time to cure the default. The forbearance agreement required Acadia to make a $3 million principal payment by August 6, 2009. When Acadia failed to do so in the agreed time, Harris declared a default and filed this suit to collect the debt from Acadia and to enforce Hershey's guaranty. The federal courts have jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship.

The district court granted summary judgment in favor of Harris as to all issues except the calculation of prejudg-

ment interest. *Harris N.A. v. Acadia Investments L.C.*, 2010 WL 4781458 (N.D. Ill. Nov. 16, 2010) (Gettleman, J.). The prejudgment interest issue was resolved by stipulation, and on February 4, 2011, with the consent of all parties to his jurisdiction, Magistrate Judge Schenkier entered a final judgment in favor of Harris and against both Acadia and Hershey in the principal amount of $15,500,000, plus $978,821.81 in prejudgment interest.

Hershey and Acadia filed separate appeals. The appeals were consolidated, but Acadia sought bankruptcy protection and its appeal has been stayed. Order, *Harris N.A. v. Acadia Investments, L.C.*, No. 11-1707, Doc. 8 (7th Cir. April 13, 2011). Hershey has pursued this appeal of his guaranty on his own behalf. Both Acadia and Hershey were represented by counsel in the district court, but Hershey, who is a member of the Ohio bar, has represented himself in this appeal.

II. *The Merits*

Hershey raised numerous defenses to Harris's claim, all of which the district court rejected. Hershey has raised many of these defenses again on appeal, although the legal and factual bases for most are simply not clear. None of the defense arguments has merit.

Hershey's main argument on appeal is that Harris induced Acadia to execute the forbearance agreement by promising to help Acadia sell investments to pay its debt to Harris, and that this fraudulent inducement plus the breach of the promise rendered the forbear-

ance agreement invalid. Hershey also argues that Harris was commercially unreasonable in refusing to accept interest payments that Acadia allegedly sent to Harris in May, July, and, August 2009, and in declaring the entire debt due upon Acadia's default in August 2009. Finally, Hershey disputes the amount of the prejudgment interest in the final judgment.

A. *Standard of Review*

We review the district court's grant of summary judgment *de novo*, drawing all reasonable factual inferences in favor of the non-moving party, here, Mr. Hershey. *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 923 (7th Cir. 2012). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, the non-moving party must then go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 694 (7th Cir. 2006). A mere scintilla of evidence in support of the non-moving party's position is not sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Id.*, citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

B.  *Validity of the Forbearance Agreement and the Declaration of Default*

Hershey argues first that the June 2009 "Forbearance Agreement and Second Amendment to the Credit Agreement" is not enforceable because he and Acadia were induced to sign the agreement by Harris's supposed material misrepresentations and/or false promises that Harris would help Acadia sell some of its assets. Hershey bases this defense on evidence from the parties' negotiations over the forbearance agreement, specifically, an email that David Hanni of Harris sent to Hershey on May 26, 2009 regarding some Acadia assets, referred to as Fannie Mae strips, that it wanted to sell to meet part of its obligations to Harris. Hanni wrote to Hershey:

> Loren, have not seen the formal 'bid package' you mention but I took the liberty of getting a quote this morning on the strips. If we bought these today from Acadia we would offer $1,964,887.00. Let me know how that stacks up against quotes from other sources.

App. 146.

Hershey claims that this email is evidence that Harris promised to help Acadia sell the Fannie Mae strips. Hershey also claims that he and Acadia agreed to the forbearance agreement based on this promise. According to Hershey, Harris never followed through by buying the Fannie Mae strips or by otherwise helping Acadia liquidate its assets to pay Harris. This is the factual basis for the asserted defenses of fraud in the inducement, duress, and violation of the duty of good faith and fair dealing.

The first problem with these defenses is the complete inadequacy of the evidence. The Hanni email of May 26 is not a promise to buy anything, let alone an open-ended commitment to provide unspecified help to Acadia in liquidating its assets. The email was not phrased in terms of an offer to help Acadia sell its assets. The most generous reading of this email from Hershey's perspective is that, despite its cautious wording, perhaps it might be read as an offer to buy a specific asset on that specific day at the specified price. There is no evidence that Hershey or Acadia ever accepted the offer, which obviously expired the same day. Hershey has offered no explanation or response to this problem. Hershey also has not offered other specific evidence to support his defenses.

The second problem with these defenses is posed by the Illinois Credit Agreement Act, 815 Ill. Comp. Stat. 160/1 *et seq.*, which adopted a "strong form" of the statute of frauds by requiring a writing signed by both parties to modify a written credit agreement covered by the Act. See 815 ILCS 160/2; *Resolution Trust Corp. v. Thompson*, 989 F.2d 942, 944 (7th Cir. 1993). Hershey offers no such writing signed by both parties reflecting any relevant promises by Harris that might avoid or defeat the guaranty.

Hershey tries to avoid application of the Illinois Credit Agreement Act on the theory that the Harris loan to Acadia was primarily for "personal, family or house-hold purposes." Such credit agreements are excluded from the Act. See 815 ILCS 160/1(1). He elaborates on this theory in several ways. He points out that Acadia Invest-

ments is a family investment company for certain purposes of federal securities laws, that he dealt with a division of Harris that tailors its banking services to family-owned businesses, and that distributions from Acadia were used primarily to pay the Hershey family's living and personal expenses.

This attempt to avoid the Act based on the purpose of the loan must fail. Credit agreements are excused from the Act's strong form of the statute of frauds only if they are "primarily for personal, family, or household purposes." 815 ILCS 160/1. But Hershey and Acadia admitted before the district court that the loan was not primarily for such purposes. Harris, in its statement of material facts submitted to the district court, asserted the following as an undisputed fact:

> The primary purpose of this revolving credit facility was to allow Acadia to finance contributions and capital calls into various private equity funds, hedge funds, and real estate funds (collectively, "Private Equity Funds"), that Acadia both then owned and would subsequently acquire, with approximately $5.5 million of these funds to be utilized to refinance outstanding indebtedness of Acadia with KeyBank in Cleveland, Ohio, and to further pay off a $1.3 million short-term promissory note Harris had approved for Hershey to finance two Private Equity Fund capital calls that Acadia was required to make at that time.

Hershey and Acadia responded: "This fact is not contested." Hershey has offered no basis for excusing him from this admission in the district court concerning

the "primary purpose" of the loan. In fact, the original credit agreement itself provided: "The proceeds from the Loan hereunder shall be used by the Borrower primarily, but not exclusively, for the purpose of purchasing and/or funding limited partnership equity interest in the Funds [identified in an exhibit to the agreement], and refinancing an existing secured credit facility." App. 263, § 1.2.

Apart from the factual admission, Hershey has offered no legal authority or coherent argument for interpreting the Illinois Credit Agreement Act's "primary purpose" element as allowing a debtor to look beyond the immediate uses of the loan proceeds. Such indirect and ultimate benefits are not sufficient to take advantage of the Act's exception for loans "primarily for personal, family, or household purposes." The Act would otherwise have virtually no real application. We can assume that all commercial loans covered by the Act are intended for the ultimate personal benefit of individuals, families, and households, perhaps through several layers of business organization ownership and perhaps many years of business activity.

The Illinois Credit Agreements Act bars Hershey's defenses, as they are based on alleged modifications to the agreement that are not in writing, let alone signed by both parties. *Whirlpool Financial Corp. v. Sevaux*, 874 F. Supp. 181, 185-86 (N.D. Ill. 1994), *aff'd*, 96 F.3d 216 (7th Cir. 1996). Thus, Hershey's defenses of fraudulent inducement, duress, and false promises fail for this reason, as well.

Hershey also argues that it was commercially unreasonable for Harris to accelerate the debt according to the terms of the forbearance agreement after Acadia defaulted in August 2009. He makes two arguments to this effect. First, he argues that it was commercially unreasonable to accelerate the debt because Harris rejected interest payments that Acadia had attempted to make in May, July, and August 2009. (According to Hershey, Acadia sent $58,614.87 on May 4, 2009; $60,375 on July 31, 2009; and $60,590.65 on August 4, 2009. App. 70, ¶ 34.)

This argument also lacks merit. Nothing in the forbearance agreement required Harris to accept the interest-only payments when a principal payment was due. See App. 263-67, 268, 326 (no requirement that Harris accept interest in payments). Even if Harris had accepted the interest payments, they would not have saved Acadia from default in August 2009 because they amounted to only $179,580.52, less than six percent of the $3 million in principal that the forbearance agreement required Acadia to pay by August 6, 2009.

Second, Hershey claims that in September 2009, he gave Harris Acadia's 2008 tax return showing its assets totaled almost $56.2 million. He argues that should have been sufficient collateral to assure Harris that Acadia could satisfy the loan requirement to keep the loan principal less than 35 percent of its assets. Hershey claims it was commercially unreasonable for Harris to accelerate the debt after he presented the return to Harris in September 2009. We need not devote much effort to rejecting this argument. Hershey has not

offered any legal authority or coherent argument for using this theory to avoid his obligations as a guarantor after the admitted and undisputed default under the forbearance agreement in August 2009. In addition, under the circumstances here, a debtor's statement of its own finances eight months prior to a default, from December 2008 to August 2009 — one of the most devastating financial periods since the Great Depression — provided no assurance of the debtor's ability to pay a debt in September 2009 on which it had already defaulted at least twice since December 2008. Harris was entitled to accelerate the debt upon Acadia's default under the forbearance agreement, as the agreement clearly authorized.

C. *Prejudgment Interest*

In the district court the parties disputed the correct calculation of prejudgment interest on the $15.5 million principal debt. District Judge Gettleman denied summary judgment on the question because of conflicting evidence as to whether and for how long a portion of the debt would bear interest at the LIBOR rate. 2010 WL 4781458, at *7. The parties consented to have this final disputed issue resolved by the magistrate judge. Judge Schenkier held a hearing on February 4, 2011 and was informed by both counsel that the parties had reached an agreement on the relatively modest amount in dispute and had agreed on both a total amount of prejudgment interest and the terms of the final judgment. The judge then entered the final judg-

ment that included $978,821.81 in prejudgment interest through February 4, 2011.

The attorney for both Acadia and Hershey then withdrew, and Hershey personally filed a motion to modify the final judgment and a motion to stay execution of the final judgment. His motions sought credit for a post-judgment payment of $101,895 that he said had been wired directly to Harris and another supposed payment for $335,649.03. Hershey did not offer any evidence that such payments had been made. There was certainly no need for the final judgment to take into account a payment that had not yet been made. Harris will of course need to give Hershey and Acadia appropriate credit for any payments made on their account toward satisfaction of the final judgment, but Hershey has shown no basis for setting aside his counsel's stipulation on the calculation of prejudgment interest or for otherwise modifying the final judgment.

Accordingly, we AFFIRM the judgment of the district court.


III. *Sanctions Under Rule 38*

Federal Rule of Appellate Procedure 38 authorizes a United States court of appeals to award damages and single or double costs to an appellee where an appeal is frivolous. Rule 38 has both a compensatory purpose and a deterrent purpose. *Ruderer v. Fines*, 614 F.2d 1128, 1132 (7th Cir. 1980); *Clarion Corp. v. American Home Products Corp.*, 494 F.2d 860, 865-66 (7th Cir. 1974); see also *Burlington Northern R.R. Co. v. Woods*, 480 U.S. 1, 7

(1987). The rule can compensate the winner of a judg-
ment for the expense and delay of defending against
a meritless appeal, and it seeks to deter such appeals
to protect the appellate court's docket for cases worthy
of consideration. *Ruderer*, 614 F.2d at 1132.

Rule 38 requires either a separate motion by the
appellee or notice from the court and a reasonable op-
portunity to respond. During and after oral argument,
we ordered appellant Hershey to show cause why sanc-
tions should not be imposed under Rule 38 for a
frivolous appeal. He has responded in writing.[1]

We do not invoke Rule 38 lightly. Reasonable lawyers
and parties often disagree on the application of law in
a particular case, and this court's doors are open to con-
sider those disagreements brought to us in good faith.
See, *e.g.*, *Kile v. Comm'r of Internal Revenue*, 739 F.2d 265,
269 (7th Cir. 1984); *NLRB v. Lucy Ellen Candy Div.*, 517 F.2d
551, 555 (7th Cir. 1975) ("A frivolous appeal means some-
thing more to us than an unsuccessful appeal."). An
appeal can be frivolous, though, "when the result is
obvious or when the appellant's argument is wholly
without merit." *Spiegel v. Continental Illinois Nat'l Bank*,
790 F.2d 638, 650 (7th Cir. 1986), quoting *Indianapolis
Colts v. Mayor and City Council of Baltimore*, 775 F.2d 177,
184 (7th Cir. 1985); accord, *e.g.*, *Wiese v. Community Bank
of Central Wis.*, 552 F.3d 584, 591 (7th Cir. 2009). When
an appeal is frivolous, Rule 38 sanctions are not

---

[1] As noted, appeal No. 11-1707, has been stayed pending
Acadia's bankruptcy proceedings; this sanction applies only
to Hershey's appeal brought on his own behalf.

mandatory but are left to the sound discretion of the court of appeals to decide whether sanctions are appropriate. *Burlington Northern*, 480 U.S. at 4; *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 566 (7th Cir. 2011) (declining to impose sanctions in close case).

We find that this appeal is frivolous. The original credit agreement and guaranty and the first amendment are all undisputed, and Hershey has agreed that Acadia was in default in early 2009 when it missed a required repayment of $3 million in principal. He also concedes that he and Acadia agreed to the forbearance agreement, which required a payment of $3 million in principal by August 6, 2009, and that the payment was not made.

We have reviewed the record from the district court, including briefing on the bank's motion for summary judgment, as well as all of Hershey's submissions to this court. We do not find in any submission to this court a coherent argument based on record evidence and a reasonable view of applicable law that would provide even an arguable basis for reversing any part of the district court's judgment.

We find instead efforts to dispute facts that Hershey and Acadia agreed were undisputed in the district court. We find an effort to twist an email with an unaccepted offer to buy an asset for a specific price on a specific date into a broad but enforceable promise to help Acadia sell its assets. We find an effort to repudiate Hershey's own counsel's stipulation to resolve the minor dispute over the calculation of prejudgment interest, and we find an effort to claim credit for a sup-

posed prejudgment payment that is not supported by evidence and appears not to have been made at all. During oral argument, members of the court asked Hershey to support his repeated beliefs about the merits of his arguments by directing the court to specific evidence and legal authority. Hershey could provide no meaningful or relevant responses.

We have found appeals frivolous where the appellants simply failed to put together a coherent argument that came to grips with the applicable law, the relevant facts, and the district courts' reasoning. *E.g.*, *Williams v. U.S. Postal Service*, 873 F.2d 1069, 1075 (7th Cir. 1989) (imposing Rule 38 sanctions where appellant failed to cite relevant cases or address district court's reasoning); *Rosenburg v. Lincoln American Life Ins. Co.*, 883 F.2d 1328, 1339-40 (7th Cir. 1989) (imposing Rule 38 sanctions on life insurance company that refused to pay death benefit and then appealed adverse jury verdict without coming to grips with applicable law and relevant evidence); see also *Greviskes v. Universities Research Ass'n, Inc.*, 417 F.3d 752, 760 (7th Cir. 2005) (ordering appellant to show cause why Rule 38 sanctions should not be imposed where arguments on appeal were "almost incomprehensible and entirely nonsensical" and there was "simply no legal foundation" for claims). By this standard, this appeal is frivolous.

It is not enough, though, that the appeal is frivolous. We must also consider whether, in the exercise of our sound discretion, Rule 38 sanctions are otherwise appropriate. *E.g.*, *Smeigh*, 643 F.3d at 565-66. A brief that fails

to provide clear and cogent arguments for overturning a district court decision can cause us to doubt whether the appellant pursued the appeal with any reasonable expectation of altering the judgment. *Spiegel*, 790 F.2d at 650.

Several factors persuade us that sanctions are appropriate in this case. The dispute here is over an eight-figure loan from a bank to a sophisticated borrower: a family investment vehicle that is run by an experienced attorney and investor who guaranteed payment of the debt. That attorney and investor, appellant Hershey, has presented no plausible basis for setting aside the district court's judgment, which was supported by a concise and correct explanation. Any competent attorney should have understood that Hershey's briefs and argument simply failed to address the applicable law and relevant evidence. His briefs and argument were exercises in obfuscation and confusion, with repeated and vague assertions of the need to hear all the evidence and look to all the circumstances. Hershey's appeal amounts in sum to a vague and unsupported assertion that the bank acted in bad faith by declaring a default and asserting its contractual rights against the borrower and guarantor long after the loan had gone into default. The Illinois Credit Agreement Act bars Hershey's efforts to avoid the written terms of the credit agreements, and Hershey's efforts to avoid the terms of the Act required him to deny and dispute facts that he had already admitted in the district court.

At the same time, post-judgment interest rates are so low that there is a clear incentive for Hershey to try to

stall enforcement of the judgment. (Post-judgment interest on this Feb. 4, 2011 judgment is just 0.28 percent per year. See http://www.federalreserve.gov/releases/h15/data.htm, with weekly data for Treasury bills with constant maturity of one year.) Hershey surely must understand as much. The objective circumstances here — the combination of Hershey's sophistication, the clarity of the district court's correct decision, Hershey's complete failure to come to grips with applicable law and facts, and the financial incentive for delay — are such that we find it appropriate to impose Rule 38 sanctions. We see no apparent mitigating factors that weigh against imposition of Rule 38 sanctions.

Accordingly, appellee Harris N.A. may submit an affidavit and supporting papers within 28 days after issuance of this opinion specifying its damages from this frivolous appeal by Mr. Hershey. Mr. Hershey may file a written response no later than 28 days after Harris files its affidavit.

SO ORDERED.