# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**MARK D. GERTH**
Kightlinger & Gray, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**GREGORY W. BLACK**
The Black Law Office
Plainfield, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE ESTATE OF NATHANIEL KAPPEL, | ) | |
| | ) | |
| | ) | |
| Appellant-Cross-Appellee, | ) | |
| | ) | |
| vs. | ) | No. 32A01-1111-ES-526 |
| | ) | |
| WILLIAM KAPPEL, JUDITH KAPPEL, AND MARK KAPPEL, | ) | |
| | ) | |
| Appellees-Cross-Appellants. | ) | |

APPEAL FROM THE HENDRICKS SUPERIOR COURT
The Honorable David H. Coleman, Judge
Cause No. 32D02-1004-ES-1

**October 30, 2012**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

For more than forty years, brothers Nathaniel Kappel ("Nathaniel") and William Kappel ("William") were amicable partners in a farming operation, with each holding an insurance policy on the life of the other. Upon Nathaniel's death in 2004, the attorney for the Estate of Nathaniel Kappel ("the Estate") filed in the Hendricks Superior Court, probate division, a petition to marshal assets, seeking recovery of $750,000 insurance proceeds paid to William. William and his son, Mark Kappel ("Mark"), filed claims against the Estate, for $350,000 and $299,000, respectively, and William and his wife, Judith Kappel ("Judith"), filed a Complaint for Contribution as to a mortgage and taxes on the brothers' farmland. The Estate counterclaimed, suing William and Judith for conversion. The Estate also sought a partnership accounting. The claims were consolidated and, at the conclusion of a bench trial, the probate court denied the Estate recovery of the insurance proceeds, directed William and Mark to withdraw their claims against the Estate, and denied the complaint for contribution. The Estate now appeals. We affirm.

**Issues**

The Estate presents four issues for review:

I.     Whether the Estate is entitled to recover $750,000 in proceeds from a life insurance policy owned by William, insuring Nathaniel's life;
II.    Whether the Estate is entitled to recover the cash surrender value of a life insurance policy owned by Nathaniel, insuring William's life;
III.   Whether the probate court erroneously found the Estate counterclaim invalid for lack of requisite signatures; and
IV.    Whether the Estate was entitled to a jury trial.

William, Mark, and Judith ("the Kappels") cross-appeal, claiming entitlement to

2

attorney's fees.

## Facts and Procedural History

On April 9, 1973, Nathaniel and William executed a "Partnership Agreement for

Kappel Brothers" providing in relevant part:

Whereas, Nathaniel and William are partners doing business as brothers with Nathaniel owning a 50% interest and William owning a 50% interest in the partnership; and

Whereas, said parties desire to provide for the purchase by the surviving party of a deceased party's interest in the business; and

Whereas, the parties desire to provide for a method of evaluating the worth of the said business upon the death of the one of them first to die, to fix the purchase price to be paid for the interest of the party first to die, and the method of payment therefor.

Now, therefore, in consideration of the mutual agreements and covenants hereinafter set forth, the parties hereto mutually agree as follows:

1. The partnership agreement heretofore existing between the parties is hereby amended in the following particulars, and where the same is inconsistent herewith, the following provisions shall control.

2. During the continuance of this agreement, Nathaniel and William agree not to sell, transfer, encumber or assign any part of their respective interests in the partnership.

3. On the death of a party, the surviving party shall purchase the deceased party's entire interest in the partnership business and the deceased party's legal representative shall sell such interest to the surviving party. The purchase price of the partnership interest of the party first to die shall be computed in accordance with the provisions of Paragraph 4 hereof.

4. The parties hereto agree and stipulate that the total value of the partnership business as of the date of this Agreement is $100,000, and the value of each partner's respective interest is: Nathaniel, $50,000; William, $50,000. Within 30 days following the end of each fiscal year of the partnership, the parties shall stipulate the value of said partnership business, and shall endorse such value on Schedule A attached hereto. If for any reason the parties shall have failed to stipulate the value for the year preceding the death of a party, the value of the partnership business shall be the higher of either of the following values:
   (a)   The last previously stipulated value; or
   (b)   The book value of the partnership as of the date of death. The determination of the accountant servicing the partnership

3

business at the time of the death of a deceased party as to the book value shall be conclusive.

In no event, however, shall the value of the interest of the party first to die be less than the amount of the insurance proceeds of the policy on such deceased party's life and subject to the terms of this agreement.

5. Nathaniel has made application for and is the owner of Policy #78-245-473, issued by the Equitable Life Assurance Society of the United States in the face amount of $50,000, insuring the life of William. William has made application and is the owner of Policy #73-256-404, issued by the Equitable Life Assurance Society of the United States in the face amount of $50,000, insuring the life of Nathaniel. . . .

6. Each party agrees to apply the proceeds of the insurance policy owned by him to purchase the partnership interest of the deceased party as provided herein; said purchase to take place at the principal place of business of the partnership within 30 days of either (a) the date of the deceased party's death or (b) the date of qualification of [the] deceased party's legal representative, whichever is later.

(App. 33-34.) The agreement could be terminated only by written agreement of the parties; however, it could be altered or amended by a writing signed by the parties. In 1977, the brothers entered into a supplemental agreement, valuing the partnership by an additional $100,000 and listing two additional $50,000 life insurance policies. The brothers also purchased life insurance policies naming their wives as beneficiaries.

On December 18, 1993, Nathaniel executed his Last Will and Testament, reciting his intention to leave to his four children:

My interest in a certain partnership by and between myself and my brother, William M. Kappel, by Partnership Agreement dated April 1, 1973, including the proceeds of any life insurance provided to purchase my partnership interest pursuant to the terms of such Partnership Agreement;
My one-half (1/2) interest in a certain parcel of real estate consisting of approximately forty (40) acres and located at 10350 West Morris Street, Indianapolis, Indiana[.]

4

(App. 30.) In 1996, William purchased from State Life Insurance Company a policy on Nathaniel's life, in the amount of $750,000 ("the State Life policy"). In turn, Nathaniel purchased from First Colony Life Insurance Company a policy on William's life, also in the amount of $750,000 ("the First Colony policy"). The premiums were paid from a Kappel Brothers Partnership account.

Nathaniel, then aged seventy-six, suffered a heart attack and died on March 20, 2004. His wife and co-personal representative, Margaret Kappel ("Margaret"), listed the First Colony policy (insuring William's life) as an asset of the Estate, but made the representation that she believed it had been cashed out in January 2004. Margaret (as opposed to Nathaniel's sons) was by that time the beneficiary of the policy that had been in existence when Nathaniel made his 1993 will ("the Equitable 801 policy"). She did not list this policy as Estate property.

The attorney for the Estate contacted William in an effort to recover the $750,000 paid on the State Life policy insuring Nathaniel's life. When informal recovery efforts were unsuccessful, the Estate filed its Petition to Marshal Assets. In turn, William and his family members filed claims against the Estate.[1]

The probate court granted summary judgment to William and Mark on the claim that they, and not the Estate, were entitled to the proceeds of the State Life policy. On appeal, a

---

[1] The ownership of the land farmed by the brothers is not in dispute. At all times, the farmland (a 39-acre tract and a 75-acre tract) was deeded to Nathaniel, William, and their spouses. Prior to the bench trial, the 39-acre farmland in Hendricks County was sold, with proceeds to be distributed one-half to William and Judith, and one-half to the Estate (for distribution to Nathaniel's four sons). Nathaniel's interest in the 75-acre tract was devised to his surviving spouse, Margaret. Margaret is Nathaniel's second spouse and not the mother of his sons.

panel of this Court reversed the grant of summary judgment, finding "there are numerous facts in dispute and the undisputed material facts are capable of supporting conflicting inferences with regard to the issue of who is entitled to the proceeds of the State Life policy." In re the Estate of Nathaniel Kappel, No. 32A05-0904-CV-205, slip op. at 7 (Ind. Ct. App. Mar. 11, 2010), trans. denied.

The matters were consolidated for a bench trial. At the request of the Estate, an accounting of the partnership was conducted. The probate court admitted extensive financial exhibits and expert testimony. The Estate did not challenge the accounting data. After the conclusion of the trial, the probate court entered its Findings of Fact, Conclusions of Law, and Judgment.[2] The ninety-four page document includes findings of fact that may be summarized in relevant part as follows:

The brothers farmed together since the 1960's, but the partnership was first formalized in a 1973 agreement, supplemented by a 1977 agreement. They did not hold the farmland as partners; rather, it was deeded to the men and their wives.

The brothers commingled personal and other assets to fund the business and such "resulted in no advantage or disadvantage to anyone." (App. 321.) They filed individual tax returns and not partnership tax returns. Funds from the brothers' construction business were also commingled with farm funds.

The 1973 partnership agreement "concerns but does not require insurance as funding the buyout of the interest in Kappel Brothers of the first brother to die." (App. 322.) The document forbids transfer of ownership in Kappel Brothers to a third party.

Initially, the brothers valued the partnership at $100,000 and purchased a $50,000 life insurance policy on each brother's life. The agreement contemplated that, upon death of one brother, the other would receive $50,000 and pay the personal representative of the deceased. The surviving brother would then be given the deceased's interest in Kappel Brothers.

---

[2] By this time, the complaint for contribution had been settled out-of-court. Nonetheless, the probate court included it in the judgment.

By June 1977, the brothers agreed the partnership was worth $200,000. The brothers purchased additional life insurance policies, Equitable 77 295 801 and 77 295 785, one for Nathaniel's life, one for William's life. The 1977 supplemental policy on Nathaniel's life, although owned by William, named Nathaniel's sons as the beneficiaries. Ownership of that policy was transferred from William to Nathaniel, and the named beneficiary was changed to Margaret.

In 1983 and in 1986, the brothers bought additional policies. The new policies were not "made part of the '73 agreement." (App. 328.) The insurance purchases "coincided with the escalating amount of debt incurred by the brothers and their wives." (App. 328.)

Nathaniel's 1993 will, leaving his sons an interest in the farming partnership and proceeds of life insurance to purchase the partnership interest, was made when the Equitable 801 policy was in effect, and at a time when the partnership was losing money. Money was being borrowed on a regular basis.

In early 1996, the brothers acquired life insurances policies payable to the surviving brother on the death of one brother. "Nothing renders either policy governed or controlled by the 1973 agreement[.]" (App. 333.) "The buy sell feature referred to in the First Colony application was intended to save the estate of a deceased from paying debt. Were the deceased partner to have had net positive equity in the partnership at death, nothing in the 1996 policies would have prevented his estate from claiming that equity from Kappel Farms." (App. 336.)

Insurance was also procured for the benefit of the brothers' spouses. Partnership funds were used to pay various policies, whether personal or related to the partnership agreement.

In the years from 1996 through 2004, Kappel Farms lost over one million dollars.

In 2001, the brothers brought Mark on board as a one-third partner, "violating § 2 of the 1973 agreement" and providing evidence that the contract had been "abandoned." (App. 341.) The name of the enterprise was changed from Kappel Brothers to Kappel Farms.

The brothers and their spouses had executed a 2004 promissory note for a business operating loan of $336,000. William and Judith had mortgaged their residence and obtained a personal line of credit to provide funds for the farming operations; the balance owed on the line of credit at Nathaniel's death was $298,004.

From 1992 through 2004, the partnership borrowed $1,501,114. "[T]he insurance policies of 1996 were taken out to cover debt and cost of farming." (App. 346.) As of

Nathaniel's death, the partnership owed $754,255 plus interest on bank loans.  In addition, William and his son were responsible for "cost of crop," which is "also known as total farm expense."  (App. 347.)  The total of debt and cost of crop, as of Nathaniel's funeral, was $1,585,504.  $653,304 was recoverable from the State Life policy, and $96,409 from the First Colony policy (for a total of $749,713).

In March 2004, Nathaniel applied to liquidate the First Colony policy.  He endorsed the check, and placed the $96,409 in the farm partnership account.

Accountants testified that the partnership had no worth at the time of Nathaniel's death, "even given the value of equipment."  (App. 350.)  The brothers' insurance agent testified that the 1996 insurance was procured to allow payment of debt and continuation of farm operations in the event of death of one of the partners.

According to the 1973 agreement, Nathaniel's heirs were to receive the greater of:  the value of his partnership interest, the applicable insurance benefits, or the last stipulated value.  Proceeds from the sole insurance policy applicable to the 1973 agreement (the Equitable 801 policy) were $53,069.  The heirs were entitled to $53,069.  Margaret received those benefits, but the Estate did not transfer Nathaniel's interest in the partnership to William.

Based upon the findings of fact, the probate court entered conclusions of law, and, on

alternate bases, denied the Estate recovery.  The conclusions may be summarized in relevant

part as follows:

Nathaniel's will did not control any policy in the case because no policy named the Estate as a beneficiary.

The 1996 insurance policies were not governed by the 1973 agreement.

As of 2004, the brothers had abandoned the original partnership agreement, having conducted their business in a manner inconsistent with maintaining the agreement, for example, bringing in a new partner and failing to observe the formalities (valuation and listing of insurance policies) contemplated by the agreement.

The insurance policies referenced in the 1973 agreement no longer existed.  The sole policy applicable (by reference in the supplemental agreement) was the Equitable 801 policy.  Margaret had received the payout and the Estate's remedy would lie, if at all, in seeking to recover those funds from Margaret.

8

The purpose of procuring the 1996 policies was not to provide benefits to heirs, but to allow the brother surviving after the other's death to have funds for the escalating debt and cost of crops. William, left responsible for significant obligations of the partnership, received and used money for this purpose and did not convert funds, breach the partnership contract, or wrongfully withhold an asset of the Estate.

The Estate was not entitled to the proceeds of the First Colony policy, which Nathaniel had cashed-out shortly before his death to infuse additional funds into the partnership.

The Estate is liable for partnership debt as of 2004 and, based upon the accounting requested by the Estate, Nathaniel would have owed $268,248 at the time of his death. The Estate would be liable for that sum and also contribution to cost of crop, had not William and Mark expressed a willingness to withdraw claims against the Estate upon retention of the contested insurance policy proceeds. "The Estate has no money coming by reason of Nathaniel's death, no interest or claim in or against Kappel Farms, under any measure." (App. 372.)

The Kappels are not entitled to attorney's fees for defending groundless claims.

The Estate's counterclaim (to the complaint for contribution) was "improperly brought" and "also is inequitable." (App. 389.)

Jury trial was denied because of the equitable nature of the petition to marshal assets, the complaint for contribution, and the necessity of an accounting and winding up of partnership affairs. "However one views the proceedings, the contentions, [and] the disputes, this litigation represents the probate accounting for a partnership in the process of dissolution, including the contested disposition of several insurance policies the partners purchased from 1973 through 1996." (App. 391.)

The Estate appeals the denial of its claims for insurance proceeds. The Kappels cross-appeal the denial of attorney's fees.

**Discussion and Decision**

<u>Standard of Review</u>

The Estate had the burden of proof at trial, and now appeals from a negative judgment; it may prevail on appeal only upon establishing that the judgment is contrary to

law. Gates v. Houston, 897 N.E.2d 532, 535 (Ind. Ct. App. 2008). The Estate must establish that the evidence is without conflict and leads to but one conclusion, which the trial court did not reach. Truck City of Gary, Inc. v. Schneider Nat'l Leasing, 814 N.E.2d 273, 278 (Ind. Ct. App. 2004). We will neither reweigh the evidence nor judge the credibility of the witnesses, and will consider only the evidence most favorable to the judgment together with all reasonable inferences that may be drawn therefrom. Id.

Additionally, the probate court entered Indiana Trial Rule 52 findings and conclusions at the request of the Estate. Our standard of review when the trial court has set forth specific findings and conclusions at the request of a party is well settled:

> First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

Balicki v. Balicki, 837 N.E.2d 532, 535-36 (Ind. Ct. App. 2005) (quoting Carmichael v. Siegel, 754 N.E.2d 619, 625 (Ind. Ct. App. 2001)), trans. denied.

The purpose of specific findings and conclusions is to provide the parties and reviewing courts with the legal theory upon which the trial court relied in reaching its decision. Balicki, 837 N.E.2d at 536 (citing Nance v. Miami Sand & Gravel, LLC, 825 N.E.2d 826, 834 (Ind. Ct. App. 2005), trans. denied). We may affirm a judgment on any

10

legal theory, whether or not relied upon by the trial court, so long as the trial court's findings are not clearly erroneous and support the theory adopted. Mitchell v. Mitchell, 695 N.E.2d 920, 923-24 (Ind. 1998). "Where trial court findings on one legal theory are adequate, findings on another legal theory amount to mere surplusage and cannot constitute a basis for reversal even if erroneous." Borth v. Borth, 806 N.E.2d 866, 870 (Ind. Ct. App. 2004) (citing Roser v. Silvers, 698 N.E.2d 860, 863 (Ind. Ct. App. 1998)).

State Life Policy

The Estate contends that the probate court erred in concluding that the $750,000 proceeds from the State Life policy is not property of the Estate. The State Life Policy was paid to William in accordance with the terms of that policy contract. However, the Estate claimed that William was obliged – pursuant to the 1973 contract between himself and his brother – to tender that amount to Nathaniel's estate. According to the Estate, William's failure to do so amounted to breach of contract and conversion.[3]

The probate court was asked to determine whether the State Life Policy was encompassed by the 1973 agreement and, if so, whether the terms of that agreement required disgorgement of insurance proceeds to the Estate. The existence of a contract is a question of law. Batchelor v. Batchelor, 853 N.E.2d 162, 165 (Ind. Ct. App. 2006). The basic requirements are offer, acceptance, consideration, and "a meeting of the minds of the

_____

[3] The tort of civil conversion is the appropriation of the personal property of another to the offender's own use and benefit, or its destruction, or the exercise of dominion over the property, in exclusion and defiance of the rights of the owner or lawful possessor, or withholding it from the owner's possession, under a claim and title inconsistent with the owner's. Schrenker v. State, 919 N.E.2d 1188, 1194 (Ind. Ct. App. 2010), trans. denied. The Estate's "conversion" claim is essentially that William had no entitlement to insurance proceeds because he was contractually obligated to surrender them to the Estate.

11

contracting parties." Id. However, the intention of the parties to a contract is a factual matter which must be determined from all the circumstances. Zimmerman v. McColley, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005).

"The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted." Baker v. Estate of Seat, 611 N.E.2d 149, 152 (Ind. Ct. App. 1993). Abandonment may be inferred from the conduct of the parties, and a contract will be treated as abandoned when one party acts inconsistently with the existence of the contract, and the other party acquiesces. Id. Abandonment of a contract is a mixed question of law and fact; that is, what constitutes abandonment is a question of law and whether there has been abandonment is a question of fact. Id.

The probate court found that the brothers did not create and maintain a Schedule B to list insurance policies applicable to the 1973 agreement. Nor did they annually update the partnership valuation, as contemplated by the agreement. Significantly, they welcomed a third party in the farming operation. This was a clear violation of the 1973 agreement. However, both brothers were in accord. Based upon the foregoing facts, the probate court found the 1973 contract abandoned.

The Estate does not challenge the sufficiency of the evidence to support the probate court's factual findings. Rather, the Estate reiterates its position that there was "evidence which established by a preponderance that the intent of Nathaniel and William in purchasing the 1996 life insurance policies was for the purpose of complying with the buy-sell

12

provisions of the 1973 Partnership Agreement." Appellant's Brief at 6.[4] Essentially, the Estate claims that there was conflicting evidence, but the probate court should have made a different finding as to intent to abandon. The Estate establishes no clear error.

<u>First Colony Policy</u>

The Estate also claimed that William and Judith had converted the proceeds of the First Colony policy. The trial court found that the Estate had presented no evidence and no theory to support such a claim.

Indeed, the evidence disclosed only that Nathaniel, shortly before his unexpected death, applied to liquidate the policy on William's life. The check was received, endorsed, and deposited into the Kappel Farms account. By all indications, this was necessary to address the mounting losses of the partnership. Although Eugene Kappel testified that he did not recognize the signature on the insurance check as that of his father, he also testified that he was not alleging the instrument had been forged. Even assuming that Eugene did not, in fact, recognize the signature for some reason, his equivocal testimony does not provide evidence of conversion, much less point to clear error in the probate court's judgment.

<u>Defective Counterclaim</u>

The Estate challenges the probate court's conclusion that the counterclaim was defective because it was signed only by Donald Kappel and not by counsel for each of the co-personal representatives. The Estate strenuously argues that, although Donald Kappel signed

---

[4] Inexplicably, the Estate also argues that "there was no evidence that, at the time of Nathaniel's death, any policies insuring Nathaniel and William existed except for the State Life and First Colony policies." Appellant's Brief at 7. However, it is uncontroverted that the Equitable 801 policy was in force and was paid to Nathaniel's widow upon his death.

the counterclaim, Margaret Kappel "ratified" the pleading by her lack of objection or motion to strike. Appellant's Brief at 13. Nonetheless, the probate court decided, on the merits, that the Estate could not prevail on its counterclaim for insurance proceeds, and the findings and conclusions regarding a technical defect are mere surplusage. The Estate is not entitled to reversal on this basis. Borth, 806 N.E.2d at 870.

### Right to Jury Trial

Finally, the Estate contends that the probate court erroneously failed to grant its motion for a jury trial pursuant to Indiana Trial Rule 38(A), which provides in relevant part:

> Issues of law and issues of fact in causes that prior to the eighteenth day of June, 1852, were of exclusive equitable jurisdiction shall be tried by the court; issues of fact in all other causes shall be triable as the same are now triable.

Whether certain claims entitle a party to a jury trial presents a pure question of law. Lucas v. U.S. Bank, N.A., 953 N.E.2d 457, 460 (Ind. 2011). We thus review the issue de novo. Id. The Indiana Constitution preserves the right to a jury trial only as it existed at common law, and a party is not entitled to a jury trial on equitable claims. Id. (citing Songer v. Civitas Bank, 771 N.E.2d 61, 63 (Ind. 2002)). "Indiana Trial Rule 38(A) embodies this principle[.]" Lucas, 953 N.E.2d at 460. The inclusion of an equitable claim, without more, does not justify drawing the whole case into equity; rather, a court should look at the "essential features of a suit." Id. at 461. If the lawsuit as a whole is equitable and the legal causes of action are not "distinct or severable," there is no right to a jury trial because equity subsumes the legal causes of action. Id.

14

The Estate presents a cursory allegation that the relief it sought "was a money judgment which could be awarded in an action at law" and thus "the estate was entitled to have the counterclaim tied [sic] to a jury." Appellant's Brief at 13. The Estate cites a single case, Farrell v. Hunt, 124 N.E. 745 (Ind. 1919), but fails to develop a corresponding argument. Here, the parties' dispute centered upon whether one brother had wrongfully appropriated funds belonging to the estate of the other, or whether those funds were properly used for payment of farming debt and expense. The dispute necessitated a partnership accounting to settle an estate, a matter entrusted to the probate court. The probate court found the action as a whole to be essentially equitable, and the Estate has presented no cogent argument to the contrary. Therefore, we deny the Estate's request to remand the matter for a jury trial.

Attorney's Fees

The Kappels claim that the probate court erred in refusing to order the Estate to pay attorney's fees. Generally, Indiana follows the "American Rule" under which parties pay their own attorney's fees unless an agreement between the parties, a statute, or other rule provides otherwise. Smyth v. Hester, 901 N.E.2d 25, 32 (Ind. Ct. App. 2009) (citations omitted), trans. denied. However, Indiana Code Section 34-52-1-1(b) provides that a court "may award attorney's fees as part of the cost … if the court finds that either party" raised a "frivolous, unreasonable, or groundless" defense; persisted in litigation even after that defense "clearly became frivolous, unreasonable, or groundless;" or litigated in bad faith. The probate court found a lack of candor on the part of the Estate with regard to the

15

Equitable 801 policy, but ultimately concluded that a statutory award of attorney's fees was not appropriate.

A claim or defense is "frivolous" if it is taken primarily for the purpose of harassment, if the attorney is unable to make a good faith and rational argument on the merits of the action, or if the lawyer is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law. Kahn v. Cundiff, 533 N.E.2d 164, 167 (Ind. Ct. App. 1989), aff'd, 543 N.E.2d 627 (Ind. 1989). A claim or defense is "unreasonable" if, based on the totality of the circumstances, including the law and the facts known at the time of filing, no reasonable attorney would consider that the claim or defense was worthy of litigation. A claim or defense is "groundless" if no facts exist which support the legal claim presented by the losing party. Id. at 170-71.

A claim or defense is not groundless or frivolous merely because the party loses on the merits. Smyth, 901 N.E.2d at 33. Here, although the brothers amicably farmed together for four decades, they observed little formality in memorializing partnership affairs. The reasonableness of the Estate's claims could not have been adequately discerned by a reasonable attorney absent a partnership accounting. The accounting was particularly challenging, in that it spanned a large segment of time. The evidence presented to the probate court, in large part, concerned the income, expenses, and net worth (ultimately found to be a negative net worth) of the partnership. It was only after the accounting evidence was fully presented that the lack of merit in the Estate's claims was readily apparent. The Kappels have not persuaded us that they are entitled to attorney's fees for bad faith litigation.

16

Additionally, the Kappels have requested appellate attorney's fees pursuant to Indiana Appellate Rule 66(E). "[A] discretionary award of damages has been recognized as proper when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay." Orr v. Turco Mfg. Co., 512 N.E.2d 151, 152 (Ind. 1987). In considering a request for appellate attorney's fees, we exercise extreme restraint because of the potential chilling effect upon the exercise of the right to appeal. Plaza Grp. Props., LLC v. Spencer Cnty. Plan Comm'n, 911 N.E.2d 1264, 1274 (Ind. Ct. App. 2009), trans. denied. In the circumstances presented here, we find that the request for appellate attorney's fees should be denied.

### Conclusion

The probate court judgment denying the Estate recovery of insurance proceeds is not clearly erroneous. Nor is the refusal of the probate court to order the Estate to pay attorney's fees erroneous.

Affirmed.

RILEY, J., and CRONE, J., concur.