**Michelle SCHRENKER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 29A02–0902–CV–128.**

Court of Appeals of Indiana.

Jan. 19, 2010.

Mary F. Schmid, Stewart & Irwin, P.C., Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Elizabeth Rogers, David L. Steiner, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Michelle Schrenker and her husband Marcus were the subjects of an action by the Indiana Securities Commissioner. Marcus had been a registered investment adviser representative but he continued to provide investment services after his registration expired. He ultimately fled the state "with an unknown amount of investor money and/or assets purchased with investor money." (App. at 15.) The Commissioner's complaint named Marcus, Michelle, and their three corporations as defendants, and alleged the defendants collectively engaged in acts that violated the Indiana Securities Act. The trial court appointed a receiver over Michelle's assets after she agreed to a preliminary injunction that would prevent her from transferring any assets until an accounting could be completed. We affirm the appointment of a receiver.[1]

## FACTS AND PROCEDURAL HISTORY

Marcus was registered as an investment advisor with the Indiana Securities Division, and he and Michelle were principals in investment firms called Heritage Wealth Management (HWM), Heritage Insurance Services (HIS), and Icon Wealth Management (Icon). The offices were leased to both Marcus and Michelle, and Michelle kept the books and was chief financial officer (CFO) for the three firms. She was paid $11,600 monthly, and the State asserts she "did not consider her position as CFO to be simply a title."[2] (Br. of Appellee State of Indiana (hereinafter "State's Br.") at 3.) She was the majority shareholder and a director of HWM. She handled the books, recordkeeping, and ac-

---

**1.** Michelle brings this interlocutory appeal pursuant to Ind. Appellate Rule 14(A)(6): "Appeals from the following interlocutory orders are taken as a matter of right by filing a Notice of Appeal with the trial court clerk within thirty (30) days of the entry of the interlocutory order: ... (6) Appointing or refusing to appoint a receiver, or revoking or refusing to revoke the appointment of a receiver...." Michelle does not object to the injunction, but does object to the receiver taking custody, title, and control of her property.

**2.** The State mischaracterizes the evidence on which it relies for this assertion. As support for its characterization of what Michelle believed about her position, the State points to testimony by its senior investigator that Michelle never "indicated that her title was [sic]

counting for HWM and Icon, and had the authority to write checks and withdraw money from the HIS account. Marcus and Michelle agreed their assets would be held in Michelle's name because Marcus feared a "litigious industry" after 9–11. (App. at 129.)

Marcus encouraged some clients to invest in a fund that allegedly would take advantage of the relative strength of the Euro over the dollar. He instructed those clients to pay the money to HIS. Marcus apparently did not invest the money in the Euro fund; instead he and Michelle used the money in HIS for their personal expenses. In December 2008, Michelle withdrew $66,500 from the HIS account.

## DISCUSSION AND DECISION

If the Securities Commissioner believes a person

has engaged, is engaging, or is about to engage in an act, practice, or course of business constituting a violation of this article or a rule adopted or order issued under this article or that a person has, is, or is about to engage in an act, practice, or course of business that materially aids a violation of this article or a rule adopted or order issued under this article, the commissioner may maintain an action in the circuit or superior court in the county where the investigation or inquiry in question is being conducted to enjoin the act, practice, or course of business and to enforce compliance with this article or a rule adopted or order issued under this article.

\*   \*   \*   \*   \*   \*

(b) In an action under this section and on a proper showing, the court may:

(1) issue a permanent or temporary injunction, restraining order, or declaratory judgment;

(2) order other appropriate or ancillary relief, which may include:

(A) an asset freeze, accounting, writ of attachment, writ of general or specific execution, and appointment of a receiver or conservator;

(B) ordering a receiver or conservator appointed under clause (A) to take charge and control of a respondent's property, including investment accounts and accounts in a depository institution, rents, and profits; to collect debts; and to acquire and dispose of property ...

Ind.Code § 23–19–6–3.

■ Our scope of review of an interlocutory order appointing a receiver is limited. We will not weigh the evidence on appeal, and we must construe the evidence along with all reasonable inferences in favor of the trial court's decision. *In re Marriage of Gore*, 527 N.E.2d 191, 195 (Ind.Ct.App.1988). The appointment of a receiver is in the sound discretion of the trial court, and therefore our standard of review is that of abuse of discretion. *Id.*

■ Still, the appointment of a receiver is an

extraordinary and drastic remedy to be exercised with great caution. The action affects one of man's most cherished and sacred rights guaranteed by the United States Constitution—the right to be secure in his property. This right is fundamental to every society in which men are free. For these reasons the statute which grants such authority is to be strictly construed.

---

Chief Financial Officer was a ruse of any kind, or some fraudulent act and in fact she was not [CFO]," nor did she ever "indicate that she was prevented from reviewing the records of the corporations." (Tr. at 63.) The State offers no explanation why something Michelle "never indicated" serves as evidence the opposite is true.

*Crippin Printing Corp. v. Abel,* 441 N.E.2d 1002, 1005 (Ind.Ct.App.1982) (internal quotation omitted).

■■■ The appointment of a receiver is a statutorily granted authority that must be strictly construed, and it cannot be sustained unless proper statutory grounds for the appointment are sufficiently shown. *City of South Bend v. Century Indent. Co.,* 821 N.E.2d 5, 13 (Ind.Ct.App.2005), *trans. denied* 841 N.E.2d 181 (Ind.2005). The power to appoint a receiver should be exercised only when it is clear that no other full and adequate remedy exists whereby justice between the parties may be affected and a wrong prevented, and only in a clear case of extreme necessity. Accordingly, the standard by which the appointment can be justified is exceptionally stringent. *Marriage of Gore,* 527 N.E.2d at 195.

The trial court made special findings of fact and conclusions of law, as it must when deciding whether to grant a preliminary injunction. *Aberdeen Apartments v. Cary Campbell Realty Alliance, Inc.,* 820 N.E.2d 158, 163 (Ind.Ct.App.2005), *reh'g denied, trans. denied.* On review, we determine whether the findings support the judgment. *Id.* We will reverse only if the judgment is clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* We consider the evidence in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Id.*

While the record as to Michelle is quite sparse, we cannot say the trial court abused its discretion in appointing a receiver. The appointment of a receiver was premised on the trial court's conclusions Michelle "materially aided" Marcus and his corporations in violating the Securities Act by "allowing and personally converting investor funds to be used for the personal use" of her and Marcus, (App. at 19), and she was "jointly and severally liable with and to the same extent as" Marcus and his companies by virtue of her position as Chief Financial Officer of three companies.[3] (*Id.* at 11.)

---

3. The court erroneously concluded Michelle was "jointly and severally liable with and to the same extent as Marcus" and the corporations by virtue of her CFO status. The trial court cited Ind.Code § 23–19–5–9(d), which provides: "The following persons are liable jointly and severally with and to the same extent as" persons who sell securities in violation of the Act: "An individual who is a managing partner, executive officer, or director of a person liable...." Ind.Code § 23–19–5–9(d)(2). But that section applies only to private rights of action by a purchaser who is harmed by a violation of the Securities Act. Actions brought by the Commissioner, like that before us, are governed by Ind.Code § 23–19–6–3, and that section has no "joint and several" liability provision.

We addressed the scope of this section of the predecessor statute in *Manns v. Skolnik,* 666 N.E.2d 1236, 1251 (Ind.Ct.App.1996), *trans. denied.* The Indiana Securities Division brought an action against Manns, and the Commissioner found she had violated several state securities laws. Manns argued the Commissioner's action against her was unnecessary because she had tried to pay back the person who bought the unregistered security. She relied on the section of the statute that applied to private rights of action rather than the section that governed actions by the Commissioner: "No person may sue under this section ... [i]f that person received a written offer, before suit and at a time when the person owned the security, to refund the consideration paid together with interest on that amount from the date of payment to the date of repayment...." Ind.Code § 23–2–1–19(g)(1) (1996). We determined the private action section did not apply to the section governing actions by the Commissioner:

We make our determination based primarily on the statutory framework of this section. In construing a statute, it is just as important to recognize what the statute does not say as to recognize what it does say. *Irmscher v. McCue,* 504 N.E.2d 1034,

### 1. Does the Evidence Support the Findings?

Michelle notes it was to the HIS account alone that Marcus had his clients wire funds or write checks, and she asserts there was no evidence she was CFO of HIS. As we may not weigh the evidence and must construe the evidence along with all reasonable inferences in favor of the trial court's decision, we cannot say the finding she was CFO of HIS is clearly erroneous. There was evidence Michelle kept the books for HIS, and Marcus said she was CFO.[4] It is apparent she had access to the HIS checking account, as she withdrew at least $66,500 from it.[5]

Michelle next asserts there was no evidence to support the finding Marcus and Michelle "did convert investor funds for his or her own personal use," (App. at 12), as there was no evidence she intentionally or knowingly used investor funds. Her argument is premised on the statutory definition of *criminal* conversion: "A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion." Ind.Code § 35–43–4–3. A person who has suffered a pecuniary loss as a result of a criminal conversion may bring a civil action to recover the loss, and in such a civil action must prove by a preponderance of the evidence that the defendant committed the criminal act. *Jet Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind.Ct.App.2008), *trans. denied* 891 N.E.2d 49 (Ind.2008). In a criminal conversion action, criminal intent is an essential element that must be proven. *Id.* To

---

1037 (Ind.Ct.App.1987). The statute is clearly limited to civil suits filed by private individuals. As written, the statutory limitation on the right to sue is clearly applicable only to "any other party to the transaction" and not to the division. See I.C. § 23–2–1–19(a). Had the legislature intended on extending this limitation to civil suits initiated by the government, it could have included such a limitation within the statute. Moreover, the State has a separate interest to ensure the enforcement of its laws which regulate the sale of securities. Therefore, we will not extend the scope of the statute as written.

*Manns*, 666 N.E.2d at 1251. The statutes governing actions brought by the Commissioner do not include a provision for joint and several liability merely by virtue of a person's status as officer or director, and we accordingly decline the State's invitation to so "extend the scope of the statute as written." *Id.*

4. While we must conclude the record supports this finding, we are concerned the State has premised its action for a receivership, an "extraordinary and drastic remedy to be exercised with great caution," *Crippin Printing Corp. v. Abel*, 441 N.E.2d 1002, 1005 (Ind.Ct. App.1982), on such a tenuous evidentiary basis. The HIS articles of incorporation include no reference to Michelle. The only evidence to which the State directs us to support this finding is testimony by two investors. One, when questioned about HIS, told the State's investigator "Marcus said [Michelle] was the chief financial officer." (App. at 108.) That investor never "had any contact with [Michelle] at all." (*Id.*) Another investor said he never spoke to Michelle, but "I talked with Marcus many times, and his comments to me were Michelle kept the books." (*Id.* at 102.)

The record does include ample evidence Michelle was, at least nominally, an officer in the other two corporations, but there is no evidence investor money was placed in those corporations.

5. The State further asserts the money is unaccounted for and was not invested on behalf of the investors, but it offers no citation to the record to support that characterization. As evidence of Michelle's role at HIS, the State points to evidence 1) Michelle admits she is CFO of HWM, 2) HWM and HIS share an office address, and 3) "Michelle's name is on the lease." (State's Br. at 8.) It then asserts, without explanation or citation to the record, the two entities "are inescapably intertwined." (*Id.*) We decline the State's invitation to hold the fact an individual's name appears on a lease of the property where a corporation is located is evidence that individual is CFO of any corporation that rents the property.

establish that intent, a plaintiff must show the defendant was aware of a high probability his control over the plaintiff's property was unauthorized. *Id.*

■■■■ Criminal conversion requires the unauthorized control to be either knowing or intentional, but *mens rea* is not an element of tortious conversion. *Computers Unlimited, Inc. v. Midwest Data Systems, Inc.,* 657 N.E.2d 165, 171 (Ind.Ct. App.1995). Nor is good faith a defense. *Id.* Conversion, as a tort, is the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession, under a claim and title inconsistent with the owner's. *Id.*

Michelle acknowledges "there was evidence to support the trial court's conclusion that Michelle had access to the [HIS] account and that funds from that account were used in one instance to pay the loan on Michelle's home," (Br. of Appellant, Michelle Schrenker at 22), "investor funds were deposited in the [HIS] account in December of 2008," (Reply Br. of Appellant, Michelle Schrenker at 7), and Michelle withdrew money from that account that same month. As nothing in the statute or case law appears to limit the Commissioner's authority to securities violations involving *criminal* conversion, we cannot say the finding Michelle personally converted investor funds is unsupported by the evidence.[6]

Michelle asserts there is no evidence to support the finding she and Marcus put their assets in her name to protect the

assets from *criminal* liability. She is correct. The trial court found the assets were placed in Michelle's name for protection from "civil and criminal liability." (App. at 11.) But the State's investigator testified only that Michelle told him "after 911 [Marcus] indicated that, he being in what she termed he said a litigious industry, it was best to put the assets in her name in case something happened, it would be protected." (*Id.* at 129.) As the evidence indicates only that the disposition of the assets was premised on "litigation" in the "industry," the finding as to criminal liability was clearly erroneous.

Finally, the trial court found Marcus instructed his clients to "wire or write checks to [HIS, HWM, or Icon]." (*Id.* at 12.) There is no evidence any client ever wrote a check to HWM or Icon. That finding was clearly erroneous to the extent it referred to HWM and Icon.

### 2. Do the Findings Support the Judgment?

■■■■ After setting aside the unsupported findings, we are left with only the following findings as support for the ultimate conclusion Michelle "materially aided" Marcus in violating the Securities Act: the minimal evidence Michelle was CFO of HIS, and the evidence she withdrew money from the HIS account.

We cannot say those findings are inadequate to support the trial court's conclusion Michelle violated the Securities Act or "materially aided" Marcus in doing so. (*Id.* at 19.) In its Order, the trial court found the State had established a *prima facie* case Michelle "engaged in an act, practice, or course of business that materi-

6. Michelle argues for the first time in her reply brief that she did not commit civil conversion because the State did not prove the funds she withdrew "were the *specific and exact* same dollars which had belonged to the client investors." (Reply Br. of Appellant,

Michelle Schrenker at 7.) Because a party may not raise an argument for the first time in a reply brief, she has waived this argument. *Cain v. Back,* 889 N.E.2d 1253, 1259 n. 6 (Ind.Ct.App.2008), *trans. denied* 898 N.E.2d 1230 (Ind.2008).

ally aided a violation" of the Securities Act, (*id.* at 20), based on the facts she was a named officer in the corporations, she was overpaid for her duties, she let Marcus put some assets in her name, and she personally withdrew funds from the corporations' accounts.

In *Kirchoff v. Selby,* 703 N.E.2d 644, 651 (Ind.1998), our Supreme Court addressed what it means to "materially aid" a securities act violation. It interpreted a section of the predecessor statute, Ind.Code § 23–2–1–19(d), which provided:

A person who directly or indirectly controls a person liable under subsection (a), (b), or (c), a partner, officer, or director of the person, a person occupying a similar status or performing similar functions, an employee of a person who materially aids in the conduct creating liability, and a broker-dealer or agent who materially aids in the conduct are also liable jointly and severally. . . .

The *Kirchoff* Court noted the "very substantial body of law dealing with the liability of those who aid or abet a violation of the federal securities laws." 703 N.E.2d at 652. While it expressed no opinion on the conduct necessary to materially aid under the facts of that case, it did note:

The standard for 'materially aids' under state securities laws has been found by some courts to be different from federal aider and abettor liability. Compare *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 799–800 (3d Cir.1978) (Federal aider and abettor liability requires a showing of (1) existence of a securities law violation by the primary party; (2) knowledge of that violation by the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of that violation.

Substantial assistance is determined by: (a) the amount of assistance given by the person; (b) the person's presence or absence at the time of the violation; (c) the person's relation to the person committing the violation; and (d) the person's state of mind.), and *Saltzman v. Zern,* 407 F.Supp. 49, 53 (E.D.Pa.1976) (applying three prong test for federal aider and abettor liability), with *Connecticut National Bank v. Giacomi,* 242 Conn. 17, 699 A.2d 101, 121–122 (Conn. 1997) (Violation of "materially aids" provision requires showing of (1) violation of securities act and (2) material assistance by aider and abettor. Material assistance is aid that has a natural tendency to influence or is capable of influencing the decision of the purchaser.), *Foley v. Allard,* 427 N.W.2d 647, 651 (Minn.1988) (adopting three-prong federal test for aider and abettor liability but defining substantial assistance in prong three as a substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff), and *Mendelsohn v. Capital Underwriters Inc.,* 490 F.Supp. 1069, 1084 (N.D.Cal.1979) (applying substantial causal connection standard to state aider and abettor violation).

*Id.* at 652 n. 7.

▇▇▇ The conduct necessary to "materially aid" a securities law violation appears to be a question of first impression in Indiana. After considering the various definitions of "materially aid," we adopt the standard used in *Foley v. Allard,* which requires a substantial causal connection between the culpable˙ conduct of the alleged aider and abettor and the harm to the plaintiff.[7]

---

7. This standard has been recognized as consistent with common-law tort principles. *See, e.g., Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069, 1083 (N.D.Cal.1979). That court cited the Restatement of Torts § 436: "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is

In *Foley,* Foley sued Allard and R.J. Steichen & Company for securities violations. She alleged that Allard, posing as a Steichen broker, induced her to invest $10,000 and then lost most of the investment, and that Steichen materially aided Allard in his fraudulent scheme by allowing him to receive phone calls and conduct business on its premises. As to the "substantial assistance" prong of the test, Foley based her case against Steichen on three to four phone calls Steichen's receptionist took for Allard. No business was transacted in any of these calls, and Foley did not establish a substantial causal connection between the phone calls and her investment loss. Foley was seeing Allard daily—he was a good friend of mutual friends who had wholeheartedly endorsed him to her. "She had undoubtedly established sufficient confidence in him to cause these two phone calls to be irrelevant to the ultimate and unfortunate investment transaction." 427 N.W.2d at 651. Accordingly, Foley did not establish Steichen's secondary liability. *Id.*

In the case before us, by contrast, it is apparent there was a substantial causal connection between Michelle's culpable conduct, in the form of withdrawing investor funds from the HIS account, and the harm the investors suffered in the form of lost money. Therefore, the court did not err in concluding Michelle materially aided Marcus in violating the Securities Act. The appointment of a receiver was not an abuse of discretion, and we affirm.

Affirmed.

ROBB, J., and BROWN, J., concur.

responsible for the consequences of the oth-