In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 21-2622

JULIE GREENBANK,

*Plaintiff-Appellant,*

*v.*

GREAT AMERICAN ASSURANCE COMPANY,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:18-cv-00239 — **Sarah Evans Barker**, *Judge.*

———————————

ARGUED MARCH 29, 2022 — DECIDED AUGUST 30, 2022

———————————

Before FLAUM, ST. EVE, and JACKSON-AKIWUMI, *Circuit
Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* This case concerns an in-
surance dispute over a champion show horse named Thomas.
Thomas is alive and well, but Thomas's owner, Julie Green-
bank, sued her insurance carrier, Great American Assurance
Company, for failing to provide mortality coverage for
Thomas. Greenbank alleges that Great American breached the
insurance policy and acted in bad faith by unreasonably

withholding consent for Thomas's authorized humane destruction, opting instead to perform a tenotomy that destroyed Thomas's use as an athletic show horse. She also alleges that Great American's continued care and control over Thomas, long after the policy terminated, constitutes conversion and theft. The district court dismissed her claims at summary judgment, and Greenbank appeals. We conclude that the district court did not err in granting summary judgment in Great American's favor and affirm.

## I

### A. The Insurance Policy

In September 2017, Greenbank purchased an American Saddlebred gelding horse named Awesome at This (barn name "Thomas") for $500,000. Greenbank intended to use Thomas as an athletic show horse for competitive purposes.

Shortly after this purchase, Greenbank obtained a mortality insurance policy with Great American for Thomas's full purchase price. The policy, effective September 28, 2017, through September 28, 2018, provided coverage in the event of Thomas's "death" or "authorized humane destruction." The policy defines "[a]uthorized humane destruction" as the intentional destruction of a "horse" under the following circumstances:

> (1) Where we [Great American], without any condition, qualification, or reservation, have expressly agreed to the destruction of the "horse"; or

> (2) Where a "horse" sustains an injury and a "qualified veterinarian" appointed by [Greenbank] certifies to [Great American]

      that the suffering of the "horse" is incurable and so excessive that immediate destruction is imperative for humane reasons; or

(3) Where a "horse" sustains an injury or is afflicted with an excessively painful illness or disease and a "qualified veterinarian" appointed by [Great American] certifies to [Great American] that the suffering of the "horse" is incurable and so excessive that immediate destruction is imperative for humane reasons.

Under the policy, a horse's death or authorized humane destruction must result, in part, from an illness, injury, or specific surgery.

To obtain coverage in the event of Thomas's death or authorized humane destruction, the policy requires Greenbank to meet certain conditions precedent. One condition precedent requires Greenbank to immediately notify Great American if Thomas becomes ill. The policy notes that failure to provide immediate notice of Thomas's illness "will invalidate any claim under the policy." If Thomas becomes ill, the policy allows Great American to, with Greenbank's permission, assume control over Thomas's treatment. But, in the event of a covered cause of loss, the policy requires Greenbank to assist and cooperate in Great American's investigation, including by submitting to an examination under oath.

In addition to mortality coverage, the policy also includes a "Major Medical Endorsement" (MME) and a "Guaranteed Renewal Endorsement" (GRE). These provisions also require Greenbank to meet conditions precedent. Under the MME,

Greenbank may request $10,000 for "reasonable and customary veterinary fees" for Thomas's medical treatment. And under the GRE, Greenbank may renew the policy on a yearly basis.

**B. Thomas's Health**

In December 2017, Greenbank boarded Thomas at Cedarwood Farms in Evansville, Indiana, to begin training with Chuck Herbert. In February 2018, however, Thomas became sick with colic and pneumonia. Thus began Thomas's multiple visits to the veterinarian, starting first with Dr. R.H. Stone. Over the next few months, Thomas lost 50 pounds, and developed cellulitis in all four legs and uveitis in his eye. Based on this, Dr. Stone determined that Thomas was "very sick." On top of this, Thomas later pulled his right stifle, rendering him lame in his right hind; Thomas's ability to get up and down was compromised.

On April 26, 2018, Greenbank reported Thomas's pneumonia to Great American. Great American assigned Senior Claims Adjuster Charlotte Bloxsom to investigate. In June 2018, Dr. Stone informed Bloxsom that Thomas's condition had deteriorated, and that Thomas "probably" needed to be euthanized. After hearing this, Great American, pursuant to the policy, retained its own veterinarians to provide treatment for Thomas. Eventually, Thomas was transported to Hagyard Equine Medical Institute, a facility in Lexington, Kentucky, where Dr. Kathy MacGillivray became Thomas's primary veterinarian.

Dr. MacGillivray evaluated Thomas and determined that Thomas suffered from a deep lung abscess and severe laminitis. Severe laminitis is a life-threatening condition that occurs

when the coffin bone separates from the hoof capsule impeding blood flow to the tissues in a horse's foot. Dr. MacGillivray advised that based on Thomas's declining health, it would not be unreasonable to make a euthanasia recommendation. But because Thomas did not previously receive treatment for these issues, she wanted to try treatment first, before recommending euthanasia.

Thomas received treatment for his deep lung abscess first, followed by his severe laminitis. For the latter condition, veterinary podiatry specialist Dr. Brian Fraley recommended that Thomas undergo a tenotomy, which involves a one-inch incision and cutting the deep flexor tendon to restore blood flow and relieve pressure on the coffin bone. Greenbank objected to Thomas's tenotomy on the basis that it would destroy Thomas's future athleticism as a show horse; she requested more conservative treatments. But Dr. Fraley advised that the tenotomy was Thomas's only chance of regaining any athletic ability, because, after a tenotomy, the tendon would eventually heal and become functional. Dr. Fraley performed Thomas's tenotomy, and as he would later testify, Thomas's tenotomy went well and Thomas had a "remarkable" recovery.

Within a year after his surgery, Thomas gained back his weight and returned to trotting, bucking, running, and galloping around the Pine Ridge Farm, where he now resides. At oral argument, Great American shared that Thomas is still alive and doing well.

## C. Great American's Policy Actions

Per the MME, Greenbank submitted the medical bills for Dr. Stone's treatment of Thomas's pneumonia. Great

American, however, determined that certain medications, particularly the $80 for Equipoise and $982 for Marquis, were not related to Thomas's pneumonia condition and denied coverage for these treatments.

Greenbank's policy expired on September 28, 2018. To renew the policy under the GRE, she submitted a payment of $14,725.000. Great American however, denied the policy renewal based on Greenbank's failure to meet several conditions precedent, including providing Great American with immediate notice of Thomas's illness in February 2018. Under Indiana law, Great American was required to provide Greenbank with a 45-day notice of the policy's non-renewal. Because it did not do that, it renewed Greenbank's policy for 60-days. For the 60-day renewal, Great American deducted $2,418.00 from Greenbank's payment and refunded $12,307.00 to her.

Though the policy has terminated, Great American continues to care for and maintain control of Thomas.

## D. Greenbank's Lawsuit Dismissed at Summary Judgment

In November 2018, Greenbank sued Great American in Indiana state court for unreasonably refusing to euthanize Thomas and unlawfully maintaining control over Thomas. The case was removed to federal district court, and Greenbank filed an amended complaint alleging breach of contract, bad faith, theft, statutory conversion, criminal mischief, fraud (common law and constructive), common law conversion, and negligence. Both parties filed motions for summary judgment, and the district court granted summary judgment in favor of Great American.

The district court determined that Great American did not breach the policy because there was no covered cause of loss—Thomas did not die by natural causes or authorized humane destruction. Because there was no breach of contract, the district court concluded that Great American could not have acted in bad faith. The district court also concluded that Great American did not breach the policy or act in bad faith when it refused to renew Greenbank's policy under the GRE and denied coverage under the MME. As for Greenbank's theft, statutory conversion, and common law conversion claims, the district court found that Greenbank never demanded control over Thomas, and there was no evidence that such a demand would have been futile. Accordingly, the district court concluded, those three claims failed. Finally, the district court held that Greenbank failed to show criminal mischief and her negligence claims were foreclosed. This appeal followed.

## II

We review a district court's decision on a motion for summary judgment de novo, examining the factual record in a light most favorable to the non-moving party. *Martinsville Corral, Inc. v. Soc'y Ins.*, 910 F.3d 996, 998 (7th Cir. 2018). Summary judgment is appropriate if there is no genuine dispute of material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(C). Greenbank raises several arguments on appeal, which we now consider.

### A. Breach of Contract

Greenbank argues that Great American breached the insurance policy in two ways: (1) by failing to provide mortality coverage, and (2) by denying medical coverage for two

treatments Thomas received while under Dr. Stone's care. To prevail on a breach of insurance contract claim in Indiana, Greenbank must show the existence of a valid contract, breach of that contract, and damages. *Roche Diagnostics Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72, 85 (Ind. Ct. App. 2013). Here, Greenbank fails to show that Great American breached the insurance policy in either of the two ways she posits.

### 1.  *Mortality Coverage*

The mortality insurance policy at issue provides coverage in the event of Thomas's "death" or "authorized humane destruction." The policy defines "authorized humane destruction" as "the intentional destruction of a 'horse'" where Great American provides consent, or a "qualified veterinarian" certifies that immediate destruction is "imperative for humane reasons."

Here, there is no dispute that Thomas did not die naturally or by authorized humane destruction. That alone should end the inquiry into whether Great American breached a mortality insurance contract. But Greenbank contends that Great American breached the contract in another way—by "unreasonably" withholding Thomas's authorized humane destruction. As she sees it, instead of approving the authorized humane destruction of Thomas, Great American, over her objection, performed a tenotomy on Thomas, which destroyed Thomas's future athleticism. We see no support for this contention.

To begin, in making this argument, Greenbank appears to invoke the section of the policy that allows for Thomas's authorized humane destruction in three circumstances, two of

which require a qualified veterinarian, appointed by either Greenbank or Great American, to certify that Thomas had an incurable condition that required immediate destruction. The other allows Thomas's authorized humane destruction if Great American expressly consents. There are two problems for Greenbank, however: there is no evidence in the record that Thomas needed to be euthanized, and there is no evidence that Great American was required to authorize Thomas's authorized humane destruction.

As for the first problem, Thomas saw three veterinarians over a period of five months, and during that time, no veterinarian suggested that Thomas needed to be euthanized, let alone certified that fact to Great American. To be sure, Dr. Stone noted that Thomas "probably" needed euthanasia, and Dr. MacGillivray acknowledged that euthanasia was a possibility. But the possibility of euthanasia is neither certification "nor a determination that immediate euthanasia was imperative for humane reasons." Even Dr. MacGillivray's notes clarify that she wanted to try other treatments before making a recommendation for euthanasia. Those treatments worked, so Dr. MacGillivray never needed to make that recommendation.

As for the second problem, there is similarly no evidence that Great American expressly agreed to euthanize Thomas and nothing in the policy required it to. Specifically, nothing in the policy indicates that the mere possibility of euthanasia is enough to trigger Great American's express consent. The policy does not even describe under what circumstances Great American should provide express consent.

Greenbank appears to take the position that because Thomas lost his use as a show horse, Great American should

have provided authorization for Thomas's humane destruction. But we reject that proposition because nothing in the contract says that Great American was expected to protect Thomas's use as a show horse. We are thus unconvinced that Great American unreasonably withheld its express consent in the absence of a veterinarian's authorization. To protect against Thomas's use as a show horse, Greenbank could have sought a loss of use policy. She cannot now attempt to turn a mortality insurance policy into a loss of use policy by claiming that Great American unreasonably withheld authorized humane destruction. In the absence of a qualified veterinarian's certification, or any other evidence suggesting that Great American unreasonably withheld the authorized humane destruction of Thomas, Greenbank has failed to state a breach of contract claim as it relates to the denial of mortality coverage.

### 2. MME Claims

Greenbank's breach of contract claim as it relates to Great American's denial of some of Thomas's treatments under the MME fares no better. Under the MME, Great American agreed to pay for "reasonable and customary veterinary fees" incurred for Thomas's medical or surgical treatment, assuming Greenbank has met all conditions precedent. The policy defines "[r]easonable and customary veterinary fees" as "reasonable fees for a necessary veterinary service or product." Greenbank takes issue with Great American's denial of coverage for two medications prescribed by Dr. Stone: $80 for Equipoise and $982 for Marquis. As she sees it, Great American denied these two treatments without a rational basis. But Great American denied these medications as unnecessary for Thomas's pneumonia. Greenbank has not put forth any evidence showing that these medications were necessary or that

she was entitled to coverage under the MME. In the absence of such evidence, Greenbank has failed to show a breach of contract with respect to this policy provision.

## B. Bad Faith

In addition to her breach of contract claims, Greenbank argues that Great American acted in bad faith based on several policy actions relating to (1) the mortality coverage and (2) the GRE.

In Indiana, an insurer has a duty of good faith and fair dealing with an insured. *Allstate Ins. Co. v. Fields*, 885 N.E.2d 728, 732 (Ind. Ct. App. 2008). This includes an insurer's agreement to refrain from: "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 519 (Ind. 1993). An insurer breaches the covenant of good faith and fair dealing, or acts in bad faith, when an insurer denies liability knowing that there is no rational, principled basis for doing so. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). But this claim does not necessarily arise every time an insurance claim is denied or not resolved in the insured's favor, even if the denial is erroneous. *Erie Ins. Co.*, 622 N.E.2d at 520. A finding of bad faith "requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 890 (7th Cir. 2011) (quoting *Mahan v. Am. Standard Ins. Co.*, 862 N.E.2d 669, 677 (Ind. Ct. App. 2007)). To determine whether the insurer breached the covenant of good faith and fair dealing, the factfinder must be able to decide that the insurer wrongly denied coverage.

*HemoCleanse, Inc. v. Phil. Indem. Ins. Co.*, 831 N.E.2d 259, 264 (Ind. Ct. App. 2005).

### 1. *Mortality Coverage*

As we previously concluded, Great American did not wrongly deny mortality coverage, therefore, Greenbank is unable to show bad faith as to this claim. *See HemoCleanse*, 831 N.E.2d at 264. But we pause to consider Greenbank's other contention, which we did not address above: that Great American's refusal to consider Thomas's athletic ability or Greenbank's interests are indicative of bad faith. Greenbank neither explains why Great American was required to consider Thomas's athletic ability or her interests, nor does she point to a policy provision that mandates this. We are therefore hard pressed to understand how Great American acted in bad faith. Greenbank made it clear that she never approved of Thomas's tenotomy. But just because Great American did not choose the medical route Greenbank desired, or otherwise resolve the claim to her liking, does not mean Great American acted in bad faith. *See Erie Ins. Co.*, 622 N.E.2d at 520. In short, we find no evidence that Great American acted in bad faith when it decided to perform the tenotomy of Thomas, or otherwise failed to consider Thomas's use as a show horse, or Greenbank's interests.

### 2. *GRE Renewal*

Greenbank also failed to show bad faith as it relates to Great American's denial of her policy renewal request. Under the GRE, Great American guarantees that, at the end of the policy period, it will renew the mortality coverage if certain conditions precedent are met. One condition precedent is that Greenbank immediately notify Great American of Thomas's

illness or disease throughout the policy period. The policy notes that failure to provide immediate notice of Thomas's illness "will invalidate any claim under the policy."

The mortality coverage terminated on September 28, 2018. Greenbank sent Great American $14,725.00 to automatically renew the policy for a year. But Great American denied Greenbank's request for policy renewal because Greenbank failed to meet several conditions precedent, including providing Great American with immediate notification of Thomas's health in February, rather than in April. Denying renewal based on a failure to meet preconditions cannot be said to be irrational. *See Erie Ins. Co.*, 622 N.E.2d at 519 (bad faith occurs when insurer acts in an "unfounded" manner).

Greenbank disagrees. In her view, it was unreasonable and an act of bad faith for Great American to use the failure to provide immediate notice as a reason to deny her renewal under the GRE, especially when Great American overlooked this error when providing coverage under the MME. Greenbank also notes that this was the first time in fourteen years that Great American ever denied GRE renewal based on lack of immediate notice. But these observations alone are insufficient to establish a claim of bad faith. *Allstate Ins. Co.*, 885 N.E.2d at 732 (even if an insurer has poor judgment or denies a claim in error, this will not provide recovery under a bad faith claim).

Further, we note that the district court concluded that Greenbank failed to prove a breach of contract claim as to GRE renewal because Greenbank failed to show damages. Greenbank does not appeal the district court's ruling on this issue. Because Greenbank failed to show that Great American

breached the contract under the GRE, her bad faith claim fails for this reason as well. *See HemoCleanse*, 831 N.E.2d at 264.

## C. Conversion and Theft

We turn to Greenbank's claim that Great American's continued care of Thomas is unlawful. Specifically, Greenbank argues that Great American's refusal to return Thomas to her after the policy terminated constitutes theft, common law and statutory conversion.

### 1. Common law conversion

Tortious conversion, or common law conversion, is either "the appropriation of the personal property of another to the party's own use and benefit, or [] its destruction, or [] exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or [] withholding it from his possession, under a claim and title inconsistent with the owner's." *Schrenker v. State*, 919 N.E.2d 1188, 1194 (Ind. Ct. App. 2010). A plaintiff claiming tortious conversion must establish that he or she owned the property, and that the defendant's possession was unauthorized or without consent. *See id.*

Where the defendant's initial possession of plaintiff's property is lawful, conversion occurs only after an unqualified demand for return, unless such demand would be futile. *See Coffel v. Perry*, 452 N.E.2d 1066, 1069 (Ind. Ct. App. 1983). An unqualified demand would have been futile when the property had been disposed of or destroyed, or where the tortfeasor assumes a position establishing that any demand would be futile. *See, e.g., Merchants Nat. Bank & Trust Co. v. H.L.C. Enters., Inc.*, 441 N.E.2d 509, 514 (Ind. Ct. App. 1982). Because tortious conversion requires ownership, there is no

liability for conversion where property has been abandoned. *See Right Reason Publ'n v. Silva*, 691 N.E.2d 1347, 1351 (Ind. Ct. App. 1998).

There is no dispute that Great American's initial possession and control of Thomas was lawful based on the policy. Greenbank also does not dispute that she did not make an unqualified demand for Thomas's return. The dispute then is whether any demand would have been futile. Greenbank says yes, and points to Great American's motion to preserve during the pendency of the litigation. In that motion, Great American argued that Thomas should not be returned to Greenbank because she did not have his best interest in mind. The district court denied the motion.

It strikes us as unusual that Great American maintained control of Thomas long after the policy terminated. Greenbank, however, has failed to demonstrate that Great American's control of Thomas falls within the bounds of common law conversion, because of a very important fact—she never demanded Thomas, and she has failed to show that any demand for Thomas would have been futile. Though Greenbank points to the motion to preserve as support that the demand would have been futile, she failed to raise this argument before the district court, and therefore waived the argument. Outside of this, Greenbank is left without any showing that any demand in this case would have been futile. Greenbank has therefore failed to show that Great American's continued control over Thomas constitutes tortious conversion.

### 2. Statutory Conversion and Theft

Unlike tortious conversion, statutory conversion does not require a plaintiff to demand a return. *Smeigh v. Johns*

*Manville, Inc.*, 643 F.3d 554, 564 (7th Cir. 2011); IND. CODE § 34-24-3-1. Although a demand for return is not required, a plaintiff must present evidence to raise a reasonable inference that the defendant was aware that their possession was unauthorized. *Smeigh*, 643 F.3d at 564. This requires a showing that the unauthorized control was either knowing or intentional. *Schrenker*, 919 N.E.2d at 1194 (noting the differences between statutory and tortious conversion).

Similarly, theft imposes liability on individuals who knowingly or intentionally exert unauthorized control over another's property with the intent to deprive the other person of any part of its value or use. IND. CODE § 35-43-4-2. Like statutory conversion, it also requires a showing that the unauthorized control was either knowing or intentional.

Here, no evidence exists for a jury to determine that Great American knowingly or intentionally exercised unauthorized control over Thomas. As discussed above, Greenbank never requested control of Thomas, and although she is not required to show a request or demand for Thomas to establish statutory conversion or theft, the absence of such a request undermines any inference that Great American was aware that its control of Thomas was unauthorized. This is especially true when Greenbank's counsel specifically stated during a telephonic court conference that Great American could keep Thomas: When the magistrate judge asked, "Do you want the horse or not?," Greenbank's counsel replied, "No, as far as we are concerned, they can keep it." R. 95-2.

With no evidence that Great American knew that their continued control of Thomas was purportedly unauthorized, Greenbank's statutory conversion and theft claims fail.

**D.  Other Claims (Criminal Mischief, Fraud, and Negligence)**

Finally, Greenbank argues that she is generally entitled to summary judgment as to all of her claims, but she does not make specific arguments on appeal about her claims for criminal mischief, fraud, and negligence. We have made clear that perfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority are waived. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 705 (7th Cir. 2010). A party asking us to reverse a district court's judgment has an obligation to argue why we should reverse that judgment, and to cite appropriate authority to support that argument. *See id.* "Where, as here, a party fails to develop the factual basis of a claim on appeal and, instead, merely draws and relies upon bare conclusions, the argument is deemed waived." *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). Because we are not responsible for constructing the parties' arguments, Greenbank's arguments as to these claims are waived and we do not consider them. *See United States v. Lanzotti*, 205 F.3d 957 (7th Cir. 2000).

### III

Accordingly, we AFFIRM the district court's judgment.